SIMPSON THACHER & BARTLETT LLP
HARRISON J. FRAHN IV (SBN 206822)
JACQUES J. LAMOTHE (SBN 321560)
RYAN SNYDER (SBN 334846)
2475 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000
Facsimile:  (650) 251-5002
hfrahn@stblaw.com
jordan.lamothe@stblaw.com
ryan.snyder@stblaw.com

NORTHERN CALIFORNIA
INNOCENCE PROJECT
KARYN SINUNU-TOWERY (SBN 121068)
500 El Camino Real
Charney Hall, Suite 108
Santa Clara, California 95053
Telephone: (408) 554-4790
Facsimile:  (408) 554-5440
ksinunutowery@scu.edu

*Attorneys for Plaintiff Jeremy Phillip Puckett*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY PHILLIP PUCKETT,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SACRAMENTO, SACRAMENTO COUNTY SHERIFF'S OFFICE, SACRAMENTO COUNTY DISTRICT ATTORNEY'S OFFICE, MARJORIE DURENBERGER, MARCI MINTER, LORI GREGERSEN, WILLARD BAYLES, ROBERT BELL, KAY MAULSBY, DONALD HENRIKSON, AND DOES 1 through 50,<br><br>Defendants. | Case No.:  To Be Assigned<br><br>**COMPLAINT**<br>**DEMAND FOR JURY TRIAL**<br><br>Action Filed:  February 22, 2022<br>Trial Date:     To be determined |

**JURISDICTION AND VENUE**

1.      This action arises under Title 42 of the United States Code, Section 1983.  Title 28 of the United States Code, Section 1331 confers jurisdiction upon this Court over the claims alleged herein.  The unlawful acts and practices alleged herein occurred in the County of Sacramento, California, which is within this judicial district.  Title 28 of the United States Code, Section 1391(b) confers venue upon this Court.

**INTRODUCTION**

2.      Jeremy Puckett lost nineteen years of his life incarcerated in California prisons for crimes that he did not commit.  His innocence of the charges for which he was imprisoned has already been definitively proven.  He was taken into custody on April 3, 2001, subsequently convicted of murder and robbery charges following a tainted trial, and then sentenced on March 14, 2002 to eleven years plus life imprisonment without the possibility of parole.  For the next nearly nineteen years, Jeremy Puckett fought to prove his innocence.  On March 3, 2020, a judge of the Superior Court for the County of Sacramento granted Jeremy Puckett's Petition for Writ of Habeas Corpus and vacated his convictions, which paved the way for his release from prison on March 13, 2020.  On January 15, 2021, the Superior Court found Jeremy Puckett innocent of the charges for which he had been convicted.

3.      Jeremy Puckett's wrongful conviction and ensuing years of incarceration were not an accident.  They were the product of reckless and intentional misconduct across three different Sacramento law enforcement agencies by Sacramento County employees who consciously disregarded Jeremy Puckett's rights.

4.      In late 1999, scrambling to close a 1998 murder case that had gone cold, detectives of the Sacramento County Sheriff's Office latched onto the self-serving accusations of Israel Sept, a jailhouse informant who, in an attempt to minimize his own involvement in those crimes and obtain a plea deal, falsely accused Jeremy Puckett of robbing and murdering Anthony Galati. These detectives—including Defendants Marci Minter, Willard Bayles, Lori Gregersen, Kay Maulsby, and Robert Bell—knew that Sept's accusations were controverted by voluminous exculpatory evidence that they had uncovered in their investigation.  This evidence strongly

indicated that Jeremy Puckett had not committed the crimes against Mr. Galati.  But willing to secure a conviction at any cost, the detectives withheld that evidence from both Jeremy Puckett's defense counsel and Sacramento District Attorney's Office prosecutors.  The Superior Court for the County of Sacramento has already found that this suppression of evidence violated Jeremy Puckett's constitutional rights.

5. Unfortunately, the Sacramento Sheriff's Office was not alone in its willingness to violate Jeremy Puckett's rights to secure a conviction.  The Sacramento Deputy District Attorney who prosecuted Jeremy Puckett—Defendant Marjorie Durenberger—also uncovered evidence while investigating the case that would have supported Jeremy Puckett's defense.  This evidence included information that the prosecution's lynchpin witness—Israel Sept—came forward with his accusations against Jeremy Puckett only after prison officials had collected Sept's DNA, leading Sept to believe that he would be implicated in criminal activity and need leverage with which to negotiate.  The suppressed evidence also included additional information that would have undermined the credibility of Sept and other prosecution witnesses.  Unwilling to risk weakening her already thin case, Marjorie Durenberger withheld this exculpatory impeachment evidence from Jeremy Puckett's defense counsel.  The Superior Court for the County of Sacramento has also already found that this suppression of evidence violated Jeremy Puckett's constitutional rights.

6. Jeremy Puckett was further prejudiced by the reckless and/or deliberate fabrication of evidence by a Sacramento County Coroner forensic pathologist, who abandoned professional standards in estimating the time of Anthony Galati's death.  As a result of an egregiously deficient autopsy review, this forensic pathologist—Defendant Dr. Donald Henrikson—falsely reported to Sacramento Sheriff's Office investigators and Sacramento District Attorney's Office prosecutors that Mr. Galati had been killed early on Saturday, March 14, 1998, approximately 24 hours after his actual time of death in the early morning hours of Friday, March 13, 1998.  Dr. Henrikson would later testify to this false time of death at Jeremy Puckett's trial.

7. Dr. Henrikson's false time of death report directly contradicted other evidence of which Dr. Henrikson was aware and which had alerted him to a significant risk that his report was

erroneous.  Indeed, nineteen years later, the Sacramento District Attorney's Office admitted in court that Dr. Henrikson's time of death report was incorrect.  By then, however, the damage had been done, as his false report shaped the course of the Sacramento Sheriff's Office's investigation and influenced prosecutors' decision to pursue charges by causing both agencies to discount Jeremy Puckett's strong alibi evidence and ignore other suspects.

8.      These violations of Jeremy Puckett's rights did not occur in a vacuum.  At both the Sacramento Sheriff's and District Attorney's Offices, longstanding customs, practices, and/or policies had blessed these behaviors and given rise to a culture of impunity in which detectives and prosecutors knew that they would not be held accountable for violating constitutional rights. At the Sacramento Sheriff's Office, in the years leading up to Jeremy Puckett's arrest and conviction, homicide detectives—including those directly involved with Jeremy Puckett's case— admitted to intentionally violating criminal defendants' constitutional rights on multiple occasions.  Yet the Sacramento Sheriff's Office had a longstanding custom, practice, and/or policy of not disciplining detectives for such transgressions.  Similarly, at the Sacramento District Attorney's Office in the years leading up to Jeremy Puckett's arrest and conviction, prosecutors engaged in a longstanding custom, practice, and/or policy of selectively withholding exculpatory evidence relevant to criminal prosecutions from defense teams.  The violations of Jeremy Puckett's rights, perpetrated by the individual Defendants that were employed by these agencies, comported with and were caused by the practices, customs, and policies that came about as a result of these agencies' administrative failures.

9.      Jeremy Puckett now seeks justice for the nearly nineteen years of wrongful imprisonment that he endured as a result of Defendants' misconduct.  In addition, he seeks an end to the improper policies, practices, and/or customs created and maintained by Sacramento County, the Sacramento District Attorney's Office, and the Sacramento Sheriff's Office, to prevent what he experienced from happening again.

## **PARTIES**

10.      Plaintiff JEREMY PUCKETT is a resident of the State of California, County of Sacramento.  He was unlawfully incarcerated for nearly nineteen years for crimes that he did not

commit. During that time, between his April 3, 2001 arrest and March 13, 2020 release, he was incarcerated at the Sacramento County Jail and various California Department of Corrections and Rehabilitation facilities.

11. Defendant COUNTY OF SACRAMENTO ("Sacramento County") is a public entity located in the State of California, with corporate and other plenary power and with its principal executive office located in Sacramento, California.

12. Defendant SACRAMENTO COUNTY SHERIFF'S OFFICE ("Sacramento Sheriff's Office") is a public entity located in the State of California, with its principal executive office located in Sacramento County, California.

13. Defendant SACRAMENTO COUNTY DISTRICT ATTORNEY'S OFFICE ("Sacramento District Attorney's Office") is a public entity located in the State of California, with its principal executive office located in Sacramento County, California.

14. Defendant MARJORIE DURENBERGER was, at all relevant times mentioned herein, a Deputy District Attorney for the Sacramento County District Attorney's Office and is sued in her individual and official capacities. At all relevant times mentioned herein, she went by the name Marjorie Koller.

15. Defendant MARCI MINTER was, at all relevant times mentioned herein, a detective for the Sacramento Sheriff's Office and is sued in her individual and official capacities.

16. Defendant WILLARD BAYLES was, at all relevant times mentioned herein, a detective for the Sacramento Sheriff's Office and is sued in his individual and official capacities.

17. Defendant LORI GREGERSEN was, at all relevant times mentioned herein, a detective for the Sacramento Sheriff's Office and is sued in her individual and official capacities. At all relevant times mentioned herein, she went by the name Lori Timberlake.

18. Defendant ROBERT BELL was, at all relevant times mentioned herein, a detective for the Sacramento Sheriff's Office and is sued in his individual and official capacities.

19. Defendant KAY MAULSBY was, at all relevant times mentioned herein, a detective for the Sacramento Sheriff's Office and is sued in her individual and official capacities.

20. Defendant DR. DONALD HENRIKSON was, at all relevant times mentioned

herein, a forensic pathologist for the Sacramento County Coroner's Office and is sued in his individual and official capacities.

21.     Defendants DOES 1 through 50 are and/or were agents or employees of Sacramento County, the Sacramento County Coroner's Office, the Sacramento District Attorney's Office, and/or the Sacramento Sheriff's Office.  Plaintiff is ignorant of the true names and/or capacities of Defendants DOES 1 through 50, and therefore sues said defendants by such fictitious names.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff believes and alleges that each of the DOE defendants is legally responsible and liable for the incident, injuries, and damages hereinafter set forth.

22.     Each defendant proximately caused Plaintiff's injuries and damages.  Each defendant is liable for his/her personal conduct, vicarious or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care or control or upon any other act or omission.

23.     In doing the acts alleged herein, Defendants, and each of them, acted within the course and scope of their employment for Sacramento County, Sacramento County Coroner's Office, Sacramento District Attorney's Office, and/or the Sacramento Sheriff's Office.

24.     In doing the acts and/or omissions alleged herein, Defendants, and each of them, acted under color of state authority and/or under color of state law.

25.     Due to the acts and/or omissions alleged herein, each Defendant acted as the agent, servant, and employee and/or in concert with each of said other Defendants herein.

## FACTUAL BACKGROUND

**I.     The Murder of Anthony Galati**

26.     On the afternoon of Saturday, March 14, 1998, a motorist found Anthony Galati's body lying near the side of White Rock Road in Sacramento County, California.  Mr. Galati had been shot twice in the head.

27.     Mr. Galati's family and friends last heard from him in the evening of Thursday, March 12, 1998.  That night, Mr. Galati left friends to meet Larry Middlebrooks, who had told Mr. Galati that he knew where they could purchase drugs.

28.     Middlebrooks took Mr. Galati twice to an apartment rented by William Van Hill in Rancho Cordova, Sacramento County.  There, Middlebrooks's friend—Israel Sept—was selling crack cocaine.

29.     That same night, Sept telephoned Jeremy Puckett to meet him at the apartment. Jeremy Puckett had been at a family barbeque where his mother was living, attended by numerous friends and family.  He left the barbeque around 10:00 p.m. to meet up with Sept and spoke briefly to him at Van Hill's apartment.  Jeremy Puckett soon left Van Hill's apartment after it became evident to him that Mr. Galati wanted to purchase cocaine.  Jeremy Puckett returned to his mother's home prior to 11:30 p.m.  He stayed there with his family for the remainder of the night.

30.     Unbeknownst to Mr. Galati, he was being set up.  After Mr. Galati arrived at the apartment, he purchased crack cocaine from Sept.  Meanwhile, Middlebrooks alerted his friends, James "Jaymo" Reeves and Angela Dvorsky, that Mr. Galati was at the apartment.  Jaymo and Dvorsky had a history of committing set-up robberies.  Middlebrooks had called them to come to the apartment and rob Mr. Galati.  Sept stood nearby, listening to the call.

31.     Jaymo and Dvorsky arrived together at the apartment later that evening.  Jaymo and Middlebrooks spoke briefly in a back room, then Jaymo left the apartment.  Dvorsky remained at the apartment, flirting with and distracting Mr. Galati.  Jeremy Puckett was never in the apartment at the same time as Dvorsky.

32.     On information and belief, later that night, in the early morning hours of March 13, 1998, Jaymo returned to Van Hill's apartment.  Sept, Dvorsky, and Jaymo restrained Mr. Galati with electrical cords and robbed him, including of the crack cocaine that he had purchased from Sept earlier that night.

33.     On information and belief, Sept, Dvorsky, and Jaymo then moved Mr. Galati to the backseat of his own vehicle.  They then drove to a rural portion of White Rock Road in Sacramento County, California.

34.     There, on information and belief, Sept, Dvorsky, and Jaymo removed Mr. Galati from the vehicle, shot him twice, and fled the scene.  Jaymo later confessed on multiple

occasions, including to his wife and to Mr. Puckett's investigator, that he was present at the murder and that Jeremy Puckett was not present.

### II. Based On a False Tip, the Sacramento Sheriff's Office Single-Mindedly Targeted Jeremy Puckett

35.    The Sacramento Sheriff's Office, led by Defendant MARCI MINTER and Detective Stan Reed, investigated Mr. Galati's murder (the "Galati Investigation").[1]  Defendants WILLARD BAYLES, LORI GREGERSEN, KAY MAULSBY, and ROBERT BELL (with Defendant MARCI MINTER, the "Individual Sheriff Defendants") played active roles in the Galati Investigation, including but not limited to responding to the scene where Mr. Galati's body was found, collecting evidence, and interviewing witnesses.  Because the Individual Sheriff Defendants were unable to develop any solid leads, the case went cold.

36.    After the Sacramento Sheriff's Office's investigation had floundered for more than a year and a half, Israel Sept—then an inmate incarcerated in state prison for unlawfully discharging a firearm in an incident unrelated to Mr. Galati's murder—approached prison guards claiming to have information about an unsolved murder.

37.    Claiming that he had converted to Christianity and wanted to set his life straight, Sept met with Defendant MARCI MINTER and Detective Stan Reed on October 5, 1999, December 9, 1999 and May 1, 2000 to tell them that he had been present at Mr. Galati's death. Not coincidentally, prison officials had collected Sept's DNA twelve days before he first came forward in October with purported information.  Sept admitted after trial that he was afraid authorities collected his DNA because he had been implicated in the Galati murder and that it was that fear (not a desire to do the right thing) that motivated him to come forward.

38.    Sept told Defendant MARCI MINTER and Stan Reed that he had seen Jeremy Puckett—with Dvorsky acting as his accomplice—pistol-whip, rob, and kill Mr. Galati.  Sept insisted to the detectives that he had not voluntarily participated in the crime, but claimed that he had driven Dvorsky and Jeremy Puckett to a motel immediately after the murder where he paid for a room for them.  The Individual Sheriff Defendants would later collect and view the motel

---

[1] Detective Stan Reed passed away in 2008.

receipt for Sept's stay, which showed him checking in to a room during the early morning hours of Friday, March 13, 1998.

39.    Sept would later confess, both before and after Jeremy Puckett's trial, that he made up these accusations because he harbored a personal grievance against Jeremy Puckett.  He would admit that Jeremy Puckett was not involved in Mr. Galati's robbery or murder, and that he had repeated his lies at Mr. Puckett's trial both to please prosecutors and to avoid a harsher punishment for his own role in Mr. Galati's death.

40.    Nonetheless, spurred by Sept's self-serving accusations and eager to close a case involving the murder of a young, white man, the Individual Sheriff Defendants, led by Defendant MARCI MINTER, single-mindedly focused on Jeremy Puckett while disregarding all evidence that exculpated him and implicated others.  When evidence pointing to Jeremy Puckett's innocence inevitably emerged, the Individual Sheriff Defendants withheld it from both prosecutors and Jeremy Puckett.

41.    The Sacramento Sheriff's Office's investigation turned up scarcely anything with the potential to corroborate Sept's dishonest accusations.  Although the Individual Sheriff Defendants interviewed other individuals who were present at Van Hill's apartment the same night as Mr. Galati, none credibly identified Jeremy Puckett as Mr. Galati's assailant.  A woman who had been at the apartment, Patty Scott-Bostic, told the Individual Sheriff Defendants that she did not remember much from the night of the murder because she was in a bathroom "in [her] own world," a result of—by her own admission—smoking crack, drinking a large bottle of cognac, and experiencing the effects of prescription medication.  Van Hill told the Individual Sheriff Defendants that he had met Jeremy Puckett only once before and had not seen the face of the man that attacked Mr. Galati, but believed it had been Jeremy Puckett based solely on the height difference between Jeremy Puckett and Sept.  The last witness from Van Hill's apartment that the Individual Sheriff Defendants interviewed, Middlebrooks, told them that Jeremy Puckett had left before Mr. Galati was attacked.

42.    Inexplicably, the Individual Sheriff Defendants never ruled out, let alone considered, the possibility that Jaymo had participated in the crimes against Mr. Galati.  The

1    Individual Sheriff Defendants knew that multiple witnesses told the investigators that Jaymo

2    visited Van Hill's apartment on the night of the murder and had dropped off Dvorsky.  Yet none

3    of the Individual Sheriff Defendants interviewed Jaymo, ascertained whether he had an alibi, or

4    compared physical evidence (such as latent fingerprints) to him.  Nor, when interviewing other

5    witnesses, did the Individual Sheriff Defendants explore Jaymo's potential involvement in the

6    crime.  Rather, the Individual Sheriff Defendants focused their questioning on their pre-

7    determined target: Jeremy Puckett.

8         43.    These oversights were especially egregious in light of the Individual Sheriff

9    Defendants' knowledge that, on the afternoon of March 13, 1998, a day before Mr. Galati's body

10   was found, Jaymo was arrested by Sacramento Sheriff's Office deputies at an apartment a short

11   walk from Van Hill's apartment, and found to be in possession of crack cocaine—the same drug

12   that had been stolen from Mr. Galati earlier that day.

13        44.    On July 6, 2000, based on Sept's self-incriminating statements and the Sacramento

14   Sheriff's Office's flawed investigation, authorities charged Sept with the robbery and murder of

15   Mr. Galati.  Immediately after opening statements in his trial, Sept, who was facing a sentence of

16   life without the possibility of parole, accepted a plea deal of 11 years, 8 months in custody in

17   exchange for testifying against Jeremy Puckett.

18        45.    Shortly thereafter, authorities arrested Jeremy Puckett and charged him with three

19   counts: (1) murder in the first degree with special circumstances with an arming allegation, (2)

20   robbery, also with an arming allegation, and (3) felon in possession of a firearm.

21        **III.    The Sacramento Sheriff's Office's Parallel Investigation of Dvorsky's Death**

22        46.    Although Sept identified Dvorsky as a participant in Mr. Galati's murder,

23   Sacramento Sheriff's Office detectives never had an opportunity to interview her.  On May 1,

24   1998, six weeks after Mr. Galati's murder, Dvorsky was found dead—stabbed and left in the

25   American River in Sacramento.

26        47.    The Sacramento Sheriff's Office opened an investigation into Dvorsky's death (the

27   "Dvorsky Investigation"), which was led by Defendant MARCI MINTER, Defendant WILLARD

28   BAYLES, and Stan Reed.

48.     The detectives involved in the Dvorsky Investigation, including but not limited to Defendants MARCI MINTER and WILLARD BAYLES, understood the potential connection between her death and the death of Mr. Galati months earlier.  During early witness interviews that pre-dated Sept's accusations against Jeremy Puckett, the Individual Sheriff Defendants conducting the Dvorsky Investigation regularly asked witnesses about both Dvorsky's and Galati's murders.

49.     By the time of Jeremy Puckett's arrest and trial, the Individual Sheriff Defendants involved with the Galati Investigation further understood that information about Dvorsky was directly relevant to the claims against Jeremy Puckett because of Sept's accusations that Dvorsky was a principal in Mr. Galati's murder.  The Individual Sheriff Defendants even cherry-picked over a dozen Dvorsky Investigation reports of interviews with Dvorsky's family and friends to provide to the Sacramento District Attorney's Office for use in prosecuting Jeremy Puckett.

50.     The Individual Sheriff Defendants collected a substantial body of exculpatory evidence and testimony that they knew bore directly on the Galati Investigation and Jeremy Puckett's innocence.  These exculpatory documents and physical evidence, however, were never turned over to prosecutors or Jeremy Puckett's legal counsel.

### IV.     The Individual Defendants Suppressed and Fabricated Material Evidence and Prejudiced Jeremy Puckett's Trial Defense

51.     Before Jeremy Puckett's trial even began, his constitutional rights were violated, and his ability to defend himself against false charges prejudiced, by reckless and intentional misconduct across three different Sacramento law enforcement agencies.  First, Sacramento Sheriff's Office detectives with knowledge of the Galati Investigation hid—from both Jeremy Puckett and prosecutors—exculpatory evidence that they had uncovered in the course of the Galati Investigation and the Dvorsky Investigation.  Second, Sacramento District Attorney's Office prosecutors further violated Jeremy Puckett's rights by suppressing additional, material exculpatory evidence in their possession.  Third, a Sacramento County Coroner's Office forensic pathologist recklessly or intentionally fabricated false evidence concerning Mr. Galati's time of death that spurred prosecutors to ignore Jeremy Puckett's alibi and undermined Jeremy Puckett's

ability to present an alibi defense.

   A. <u>Sacramento Sheriff's Office detectives suppressed material evidence favorable to Jeremy Puckett from both prosecutors and the defense.</u>

  52. The Dvorsky Investigation turned up a voluminous amount of information that supported Jeremy Puckett's innocence.  The materials included evidence that Dvorsky and Puckett did not know one another; that Dvorsky in fact had a close relationship with Jaymo who aggressively controlled her; that Dvorsky had previously carried out set-up robberies with Jaymo similar to the one that resulted in Mr. Galati's death; and that, near the time of the murder, Dvorsky stayed with Jaymo and Middlebrooks in an abandoned apartment.

  53. Due to the interrelated nature of the investigations, all of the Individual Sheriff Defendants were aware of the evidence uncovered in both the Galati Investigation and the Dvorsky Investigation.  The Individual Sheriff Defendants worked directly on the Galati Investigation and were aware of Jeremy Puckett's prosecution, so they understood from their own work that this exculpatory evidence was relevant to Jeremy Puckett's case.

  54. Nonetheless, the Individual Sheriff Defendants suppressed hundreds of pages of exculpatory material from the Dvorsky Investigation, including but not limited to the following:

  a. **Angela Dvorsky's day planner, notebook journal and assorted letters**: Dvorsky's personal writings provided a window into her life and associates. Among other things, they contained inculpatory admissions that she had previously committed strong-arm robberies, following a consistent modus operandi of using her sexuality to lure men into situations where her friends beat and robbed them.  They also contained journal entries detailing the extent of Jaymo's control over Dvorsky's life and actions, including writings that Jaymo stole and controlled her money.  Despite journal entries that detailed Dvorsky's friends and contacts at length, her writings never once mentioned Jeremy Puckett.

  b. **Interview of Ontario Grant, dated June 1, 1998**:  In a suppressed interview taken by Defendant MARCI MINTER and Stan Reed, Ontario Grant, who knew both Dvorsky and Jaymo, stated that between January and February of 1998,

Jaymo introduced Dvorsky to "slamming dope," that Jaymo had control over her and abused her, that Dvorsky "would move when [he] said move," that Jaymo and Dvorsky lived in multiple apartments together, that Jaymo once appeared to be holding Dvorsky in an apartment against her will, and that Jaymo had once "whooped her ass" because "she messed up some money of his" and "she had to get it back."  In that same interview, Grant also told detectives about an incident in which Dvorsky had lured him to an apartment, where Jaymo and two others suddenly arrived.  Believing that he had been set up to be attacked, Grant quickly left.  Moreover, when asked by detectives during this interview whether any of Dvorsky's associates had connections to the location where Mr. Galati's body had been discovered, Grant replied, "Jaymo man."  He explained that Jaymo used to buy drugs from a man on White Rock Road and that Jaymo was now in debt with his dealers, who were "just waiting to come and go and collect."  Grant also said that Jaymo's cousin or sister dealt crack at the apartments where Mr. Galati's car was abandoned.

c.  **Interview of Tillman Douglas, dated May 13, 1998**:  Tillman Douglas, who knew Dvorsky, told Defendants MARCI MINTER and WILLARD BAYLES that in "February" and "maybe March" of 1998, Dvorsky was staying in an abandoned apartment on Woodbury with Jaymo and Larry Middlebrooks.  This information would have been crucial for Jeremy Puckett's defense team, which had received a report that Dvorsky committed the murder with two guys with whom she had been staying.

d.  **Interview of Jean Porterfield, dated July 15, 1999**:  Jean Porterfield, a woman who had stayed with Middlebrooks and knew Dvorsky, told Defendants MARCI MINTER and WILLARD BAYLES about a robbery set up by Dvorsky and Jaymo.  She recalled that Dvorsky had exited a bar with the victim, at which point Jaymo approached to rob the man.

e. **Interview of Cathryn McAfee, dated March 18, 1999**:  Cathryn McAfee, who knew and had previously lived with Dvorsky, told Defendants MARCI MINTER and WILLARD BAYLES about Dvorsky's relationship with Jaymo.  She told them that Dvorsky had been dating Jaymo and that Dvorsky "was just being used by all the guys who were close to her," including by having "her out prostituting and stealing for them."  McAfee also told the detectives that Dvorsky and Jaymo hung around with Middlebrooks.

f. **Interview of James Linderman, dated May 7, 1998**:  James Linderman, who knew Dvorsky, told Defendant MARCI MINTER and Stan Reed that Dvorsky had a relationship with Jaymo and that Jaymo would bring Dvorsky around to places.  Linderman also told them that both Jaymo and Dvorsky had connections to Middlebrooks.

g. **Interview of Christopher Smith, dated October 22, 1998**:  Christopher Smith, who knew Dvorsky and Jaymo, told Defendant MARCI MINTER that Dvorsky knew Jaymo and that he had been "messing with" her.

h. **Interview of Courtney Hribal, dated May 6, 1998**:  Courtney Hribal, who knew Dvorsky, told Defendant MARCI MINTER about Dvorsky's modus operandi of luring men into situations to be robbed by acting like she would have sex with them.  Hribal also told Defendant MARCI MINTER that Dvorsky had admitted to her sometime in March 1998 that she had lured a white boy into a situation to be robbed, that she had been present when the guys that she had been working with shot him, and that she feared they would kill her too.

i. **Witness identifications of Dvorsky's friends and acquaintances**:  The Individual Sheriff Defendants interviewed or contacted approximately 68 witnesses in the course of the Dvorsky Investigation.  They asked witnesses to identify Dvorsky's friends, acquaintances, and the people that she generally spent time with.  When doing so, the Individual Sheriff Defendants showed witnesses

photographs to refresh their memories, including a photograph of Jeremy Puckett. However, no witness identified Jeremy Puckett or mentioned him in any of the reports contained in the Sacramento Sheriff's Office's Dvorsky Investigation file.

55.     Apart from their suppression of exculpatory evidence uncovered through the Dvorsky Investigation, the Individual Sheriff Defendants suppressed additional exculpatory evidence from the Galati Investigation that indicated Jaymo, rather than Jeremy Puckett, was involved in Mr. Galati's murder.

a.  **Evidence that on March 13, 1998, Jaymo was arrested minutes away from Van Hill's apartment with crack cocaine in his possession**: A suppressed Sacramento Sheriff's Office report established that Jaymo was arrested at an apartment a short walk from Van Hill's apartment, on the afternoon of Friday, March 13, 1998.  The report not only puts Jaymo in close proximity to Van Hill's apartment near the time of the murder, but indicates that Jaymo had crack cocaine in his possession, the same drug Mr. Galati bought before his death.  Despite knowing that Jaymo had been present at Van Hill's apartment the night of Mr. Galati's death, the Individual Sheriff Defendants withheld this exculpatory evidence from prosecutors.

b.  **Evidence of a pistol from a location associated with Jaymo that may have been used to pistol-whip Mr. Galati**: A suppressed Sacramento Sheriff's Office report, dated February 3, 1999, indicates that deputies confiscated a .22 caliber Defender 89 pistol from the same apartment where Jaymo had been arrested on March 13, 1998.  The confiscated pistol had damage consistent with its having been used to strike someone.  A different suppressed February 4, 1999 Sacramento Sheriff's Office report from the Dvorsky Investigation File, written by Defendant WILLARD BAYLES, describes the apartment where the gun was found as a "Gene Whitaker's residence."  The Individual Sheriff Defendants understood the name "Gene Whitaker" to be one of Jaymo's aliases.  Defendant WILLARD BAYLES's report indicated that the deputies conducting the probation search "had

been informed that there may be subjects present at this location who would have information regarding" the Dvorsky Investigation.  On February 10, 1999, Defendant MARCI MINTER requested a Crime Lab examination of the confiscated pistol.  On the request form, she wrote "Galati was shot 2x in head by unknown subjects.  Recently, a gun was recovered in a house where an identified person lives.  Gene Whitaker."

56.    The evidence suppressed by the Individual Sheriff Defendants would have enabled Jeremy Puckett's trial counsel to (i) establish and further investigate a third-party culpability defense that Jaymo—not Jeremy Puckett—had been Dvorsky and Sept's accomplice in Mr. Galati's murder, (ii) attack the thoroughness and good faith of the state's investigation, and (iii) undermine the credibility of prosecution witnesses.

57.    The Individual Sheriff Defendants understood that these materials were exculpatory, yet suppressed all of them from both prosecutors and Jeremy Puckett's counsel.

   B.    <u>Sacramento District Attorney's Office prosecutors suppressed additional material evidence favorable to Jeremy Puckett.</u>

58.    Compounding the prejudice arising from the Individual Sheriff Defendants' suppression of exculpatory evidence, Defendant MARJORIE DURENBERGER engaged in independent violations of Jeremy Puckett's constitutional rights by suppressing additional exculpatory evidence of which she had knowledge and control.

59.    In the wake of Sept's accusations against Jeremy Puckett, Defendant MARJORIE DURENBERGER took an active role in the investigation.  On information and belief, she contacted, consulted with, and advised law enforcement officers who were working on the Galati Investigation, collected information about Sept's criminal history and prison records, and collected information about other potential trial witnesses, including but not limited to Scott-Bostic.

60.    On March 29, 2001, Defendant MARJORIE DURENBERGER filed a complaint and request for issuance of a warrant for the arrest of Jeremy Puckett with the County of Sacramento Superior Court.  In support of her arrest warrant request, Defendant MARJORIE

DURENBERGER prepared, signed, and submitted a sworn declaration that declared the following under penalty of perjury:

> That your declarant is currently employed as a Deputy District Attorney for the County of Sacramento, State of California.  That pursuant to said employment, your declarant has been assigned to investigate allegations that, JEREMY PHILLIP PUCKETT, did commit the crime(s) as set forth in the attached complaint.  That pursuant to said assignment; your declarant has contacted person(s) having knowledge of said offense(s) and who has/have prepared written reports and/or statements, and/or has received and read written reports and/or statements prepared by others known by your declarant to be law enforcement officers, all of which reports and/or statements are included in a report consisting of four (4) page(s) which is attached hereto as Exhibit I and incorporated by references as though fully set forth.

61.    Defendant MARJORIE DURENBERGER suppressed substantial impeachment evidence that she obtained while investigating Sept's accusations against Jeremy Puckett, including but not limited to:

a.    **Facts underlying Sept's prior convictions:**  Before trial, the prosecution disclosed a criminal history report for Sept detailing arrests in 1988 and 1991 for robbery, charges that were in both cases reduced to possession of stolen property, a misdemeanor.  When preparing to try Sept for Mr. Galati's robbery and murder, Defendant MARJORIE DURENBERGER moved in limine to impeach Sept with facts underlying these prior crimes—specifically, that in both cases Sept's victims had been "beaten and robbed notwithstanding the actual conviction sustained." These acts of moral turpitude were not disclosed to Jeremy Puckett's counsel.

b.    **Evidence of Sept's motive for testifying against Puckett:**  The prosecution suppressed portions of Sept's prison file that established prison officials collected samples of his DNA twelve days before he approached authorities.

c.    **Scott-Bostic's felony conviction, probationary status, mental illness, and connection to Jaymo:**  Prosecutors provided Jeremy Puckett's trial counsel with an outdated criminal history report for Scott-Bostic, which omitted nearly a year of information.  The undisclosed criminal history included a felony drug charge for which Scott-Bostic was arrested in June 2000 and sentenced to four years of

probation on December 20, 2000.  A suppressed probation report confirms that, at the time she testified, Scott-Bostic faced a risk of incarceration and thus had a correspondingly strong incentive to please the prosecutor.  The defense was unaware of her most recent conviction and the fact that she testified while on probation.  The prosecution also suppressed a note from the Sacramento District Attorney's Office's Galati file stating that, when contacted by a DA investigator while in custody, Scott-Bostic (contrary to her demeanor at trial) "did not seem too cooperative."  After trial, Scott-Bostic would say that she implicated Puckett under pressure to avoid jail time.

62.    This suppressed evidence was exculpatory and material, as it would have enabled Jeremy Puckett's trial counsel to undermine the credibility of prosecution witnesses.

C.    <u>The Sacramento County Coroner deliberately fabricated a time of death estimate that undermined Jeremy Puckett's potential alibi defense.</u>

63.    Mr. Galati's body was found on Saturday, March 14, 1998, at approximately 3:00 p.m.  On March 15, 1998, at approximately 10:30 a.m., Defendant DR. DONALD HENRIKSON conducted an autopsy of Mr. Galati's body.

64.    In his autopsy report, Defendant DR. DONALD HENRIKSON noted that, at the time of the autopsy, "[r]igor mortis is fully developed in the feet, ankles, elbows, and jaws; and is partially developed in the knees, hips, hands, wrists, shoulders and neck."  He also noted a "moderate to marked amount of blanching, violaceous-pink lividity" and "the body is cold to palpation."

65.    On March 16, 1998, Defendant DR. DONALD HENRIKSON spoke with Detective Stan Reed about the autopsy.  During that conversation, Defendant DR. DONALD HENRIKSON delivered a false autopsy conclusion that, based solely on the body's lividity at the time of the autopsy, Mr. Galati had not been dead for more than 12 hours before his body was found.  That conclusion would place the time of Mr. Galati's death no earlier than the early morning hours of Saturday, March 14, 1998.

66.    In the course of Mr. Puckett's habeas petition proceedings, 19 years too late, the

Sacramento District Attorney's Office admitted that Defendant Dr. DONALD HENRIKSON's conclusion was wrong, and that Mr. Galati had been killed in the early morning hours of Friday, March 13, 1998, nearly 24 hours earlier.

67.    Even at the time of the autopsy, Defendant DR. DONALD HENRIKSON was aware of significant flaws in his methodology that alerted him to a substantial risk that his time-of-death conclusion was false.  Under the standards of their field, forensic pathologists estimate time of death by considering a variety of factors, including but not limited to: (1) rigor mortis, (2) lividity, (3) core body temperature when discovered, (4) discovery scene temperature and weather, and (5) information regarding the last time that the person was last seen alive.  Yet here, Defendant DR. DONALD HENRIKSON failed to measure and record core body temperature, never considered the environmental conditions at the location where the body had been discovered, and never considered information regarding the last time that Mr. Galati was seen alive.

68.    Additionally, for the one factor that Defendant DR. DONALD HENRIKSON considered—body lividity—he recklessly or deliberately misapplied the science of his field. Lividity takes longer to develop when the ambient weather at a body's location is cool.  For example, Vincent J. DiMaio and Dominick DiMaio in Forensic Pathology (2d ed. 2001) state: "Livor mortis [lividity] develops gradually, usually reaching its maximum coloration at 8-12 h." They continue that it can take can take 24 to 36 hours for lividity to become fixed "if delayed by cool temperatures."  The temperature on March 13 and 14, 1998 was mainly in the 40s, 50s, and 60s, and Mr. Galati's body was at least partially shaded, the type of cool conditions that delay lividity development well beyond twelve hours.  By choosing to ignore environmental information, Defendant DR. DONALD HENRIKSON exhibited a reckless disregard for the truth in fabricating a false time-of-death conclusion.

69.    On information and belief, following Sept's accusation that Jeremy Puckett killed Mr. Galati, Defendant DR. DONALD HENRIKSON repeated his fabricated time-of-death conclusion to detectives and prosecutors to aid their investigation and prosecution of Jeremy Puckett.

70.     On information and belief, in providing aid to detectives and prosecutors, Defendant DR. DONALD HENRIKSON became aware of other evidence from their investigation that indicated Mr. Galati had been killed on Friday, March 13, 1998 rather than Saturday, March 14.  As one example, DR. DONALD HENRIKSON became aware of motel receipts indicating that Sept had rented a motel room following the murder in the early morning hours of Friday, March 13, 1998.  As another example, he also became aware of witness testimony that Mr. Galati had last been seen by friends on the evening of Thursday, March 12, 1998, the night that Mr. Galati went to Van Hill's apartment.  At a minimum, this information alerted Defendant DR. DONALD HENRIKSON to a substantial risk that his autopsy analysis had been erroneous.

71.     Defendant DR. DONALD HENRIKSON disregarded these risks, repeating his original, flawed analysis and conclusions to prosecutors in an effort to save face and avoid admitting a mistake.  His fabricated evidence shaped the course of their investigation and the subsequent trial, influencing prosecutors to discount Jeremy Puckett's strong alibi evidence for the early morning of Friday, March 13 and proceed to file charges against him.

72.     Defendant DR. DONALD HENRIKSON would eventually testify at Jeremy Puckett's trial, presenting the jury with the same false information that he had previously provided to detectives and prosecutors.  That was the same information that the Sacramento District Attorney's Office, 19 years later, conceded in open court was wrong.

**V.      Jeremy Puckett's Tainted Trial**

73.     There is no question that Jeremy Puckett's trial was tainted by Defendants' suppression and fabrication of evidence.  Arrested on April 3, 2001, he was ultimately wrongfully convicted of first-degree murder and second-degree robbery.  For almost nineteen years following his conviction, Jeremy Puckett maintained his innocence and filed numerous appeals and habeas petitions seeking to have his convictions overturned.  On March 3, 2020, the Honorable Steve White of the Superior Court for the County of Sacramento ("Superior Court") issued an order granting Jeremy Puckett's Petition for Writ of Habeas Corpus based on, among others grounds, his finding that Jeremy Puckett's *Brady* rights had been violated.  Judge White accordingly

1  ordered that the conviction and judgement in Jeremy Puckett's criminal case be vacated.  *See*

2  Complaint Exhibit A ("Habeas Order").

3        74.    On March 13, 2020, Judge White ordered that all charges against Jeremy Puckett

4  were dismissed, and Mr. Puckett was released from custody.  Jeremy Puckett subsequently filed a

5  Motion for a Finding of Innocence pursuant to Cal. Penal Code § 1485.55(b), which authorizes a

6  successful habeas petitioner to move for a finding of innocence that the crime with which he was

7  charged was not committed by him.  Under this statute, Jeremy Puckett bore the burden of

8  proving his innocence.  The Sacramento District Attorney's Office opposed and litigated this

9  motion.  On January 15, 2021, the Superior Court issued an order finding Mr. Puckett innocent of

10  the charges for which he had been convicted.  *See* Complaint Exhibit B ("Innocence Finding").

11        75.    As the Superior Court found in granting Jeremy Puckett's habeas petition, the case

12  presented by prosecutors at his trial "was not a strong prosecution case."  Habeas Order at 21.  No

13  physical evidence tied Jeremy Puckett to the crime or the crime scene.  *Id.*  Instead, "the case

14  rested on the eye-witness testimony of Israel Sept and the compromised testimony of Scott-Bostic

15  and Van Hill."  *Id.*

16        76.    Only Sept clearly identified Jeremy Puckett as Mr. Galati's assailant, so "was

17  essential to identifying Petitioner as someone involved in the robbery and murder . . . .  Without

18  Sept's testimony, there was no ca[s]e against Petitioner. "  Habeas Order at 17.

19        77.    The "corroborating" testimony of Scott-Bostic and Van Hill was "weak."  Habeas

20  Order at 17.  On probation during trial and testifying contrary to her own pre-trial statements to

21  investigators, Scott-Bostic claimed that Mr. Puckett had been present at Van Hill's apartment the

22  same evening as Mr. Galati and that he ordered her to stay in a bathroom amidst some

23  commotion.  Her perception of that night was affected by "smoking crack, drinking a 'big old'

24  bottle of cognac, and experiencing the effects of prescription medication," and her testimony was

25  "fraught with revisions and inconsistencies."  *Id.*  Van Hill testified to a cross-racial identification

26  that he saw Mr. Puckett and Sept leave with Mr. Galati, but his corroboration was "quite limited

27  insofar as he did not see the face of the man he believed to be [Jeremy Puckett], a man he barely

28  knew."  *Id.*

78.     Against the backdrop of this weak prosecution, the evidence suppressed by the Individual Sheriff Defendants and Defendant MARJORIE DURENBERGER, both collectively and individually, had a reasonable probability of altering the trial result.

79.     The Superior Court has already found this to be the case.  As the Superior Court found in granting Jeremy Puckett's Habeas Petition, the Ontario Grant, Tillman Douglas, and Jean Porterfield interviews suppressed by the Individual Sheriff Defendants demonstrate that Dvorsky and Jaymo were connected and that they committed robberies together.  Habeas Order at 9-10.  The Superior Court also found that the personal writings of Dvorsky that the Individual Sheriff Defendants suppressed evinced that Petitioner had no connection to Dvorsky.  *Id.* at 10-11 ("In these pages appear 121 men's names (excluding the names of Dvorsky's father and son) including the name Jeremy Marshall, and a Jeremy not referenced with a last name. The name of no male appears more frequently and prominently than Jaymo.").  As the Superior Court found, "[h]ad defense counsel been made aware of these facts prior to trial, it almost certainly would have changed the defense investigation as well as trial strategy. . . . The suppressed evidence referenced above was material."  *Id.* at 11-12.

80.     The Superior Court separately found that prosecutors violated Jeremy Puckett's *Brady* rights by failing to disclose the material facts and circumstances underlying Sept's misdemeanor possession of stolen property charges, which had been pled down despite the undisclosed fact that "the victims were in fact beaten and robbed," just like Mr. Galati.  Habeas Order at 12.  This suppressed information would have enabled Jeremy Puckett's trial counsel to impeach Sept and undermine his false accusations, so "[p]retrial disclosure of this information was required."  *Id.*

81.     Attempting to bolster their weak trial case, prosecutors continued to advance the false position relayed to them by Defendant DR. DONALD HENRIKSON, who had told detectives and prosecutors that Mr. Galati was killed no earlier than Saturday, March 14, 1998. Prosecutors elicited trial testimony from Defendant DR. DONALD HENRIKSON that Mr. Galati had been dead for several hours as of the afternoon of March 14.  As the Superior Court found, "during opening statement the prosecutor told the jury that Anthony Galati went to Rancho

Cordova on 'March 13th, Friday night' and met up with Larry Middlebrooks" and, throughout trial, "did not ask, but rather informed the witnesses of the date of the offense."  Habeas Order at 19.

82.    The prosecution's view of the time of Mr. Galati's death at the time of Jeremy Puckett's trial reflected a continuation of their investigative approach that had, as a result of Defendant DR. DONALD HENRIKSON's fabricated evidence, caused them to discount Jeremy Puckett's strong alibi for the night of March 12, 1998 and morning of March 13, 1998.  As the Superior Court found, and the State conceded following the presentation of expert forensic testimony at an evidentiary hearing, the events leading up to Mr. Galati's death took place on the evening of March 12 and the early morning of March 13.  Habeas Order at 19-20.

83.    That March 12 evening, Jeremy Puckett had returned to his mother's home prior to 11:30 p.m., where he stayed with his family for the remainder of the night.  Had prosecutors been focused on the correct date, Jeremy Puckett's family and friends who were also present at the house would have been able to attest to the impossibility of him having participated in Mr. Galati's murder, which likely would have discouraged prosecutors from filing charges against Mr. Puckett.

84.    This alibi evidence was considered by the Superior Court in connection with its Habeas Order and Innocence Finding.  The Superior Court found that Charon Knox, who testified at an evidentiary hearing, presented credible testimony concerning Jeremy Puckett's whereabouts at the time of Mr. Galati's death that was inconsistent with his having been present at Mr. Galati's murder.  Innocence Finding at 10-11.  The Superior Court further found that this credible alibi testimony would have impacted the trial, and that it was "of greater weight and is more persuasive than the evidence presented" by prosecutors at Mr. Puckett's trial.  *Id.*

85.    Ultimately, however, the jury did not hear Jeremy Puckett's alibi because Defendant DR. DONALD HENRIKSON had conveyed fabricated evidence to detectives and prosecutors that shaped the course of their investigation and the subsequent trial.  Nor did the jury hear the voluminous exculpatory evidence suppressed by the Individual Sheriff Defendants and Defendant MARJORIE DURENBERGER, which would have supported a defense that Jaymo

was the third participant in Mr. Galati's murder, enabled the defense to attack the thoroughness and good faith of the state's investigation, and undermined the credibility of prosecution witnesses.

86.     The case, despite all of these errors favoring the prosecution, was close.  The jury took the case on a Tuesday and deliberated until Friday afternoon, nearly as long as the trial itself. The jurors requested read-backs from every percipient witness.  In the end, jurors returned a mixed verdict.  They found Mr. Puckett guilty of robbery and murder with an arming enhancement and a special circumstance of murder committed during the commission of a robbery.  But the jury found Mr. Puckett not guilty of being a felon in possession of a firearm, rejecting the prosecution's theory that he acted as the triggerman.

87.     The court sentenced Mr. Puckett to eleven years plus life without parole on March 14, 2002.  He would be wrongfully imprisoned for the next eighteen years.

88.     In the years following Jeremy Puckett's wrongful conviction—in yet another display of blatant disregard for the law—the Sacramento Sheriff's Office and Defendant MARCI MINTER would further impede Jeremy Puckett's ability to prove his innocence by destroying much of the physical evidence that it collected in the Galati Investigation.  The Sacramento Sheriff's Office's evidence retention policy incorporates California law requiring indefinite retention of property and biological evidence relating to any crime punishable by life imprisonment without the possibility of parole.  Notwithstanding this policy, the Sacramento Sheriff's Office destroyed much of the evidence collected in the Galati Investigation, including all physical evidence (such as DNA evidence found at the crime scene, unmatched fingerprints from the crime scene, and fingernail scrapings from Mr. Galati), detectives' investigation notes (including the notes of Defendants ROBERT BELL, WILLARD BAYLES, KAY MAULSBY, and MARCI MINTER), and videos of witness interviews.  Defendant MARCI MINTER ordered the evidence's destruction.

89.     This illegal evidence destruction sharply limited Jeremy Puckett's ability to support his innocence claim.  For example, the Individual Sheriff Defendants never had Jaymo's fingerprints compared to latent prints lifted at the scene of the crime and the hood of Galati's car,

even though they had them compared to Jeremy Puckett, Sept, and others.  With the evidence

destroyed, Jeremy Puckett could not have those prints compared to Jaymo or any other potential

perpetrators of Mr. Galati's murder.  Likewise, the destroyed scrapings taken from Galati's

fingernails could not be compared to Jaymo or anyone else's DNA.  On information and belief,

the Individual Sheriff Defendants ordered this illegal destruction of evidence to cover up their

misconduct and violation of Jeremy Puckett's rights.

## VI.    The Sacramento Sheriff's Office's Customary Acceptance of Evidence Manipulation Gave Rise to a Culture of Impunity

90.    The Individual Sheriff Defendants' suppression of evidence that supported Jeremy

Puckett's innocence did not occur in a vacuum.  By the time of the investigation and prosecution

of Jeremy Puckett, a practice, custom, and/or policy had arisen within both Sacramento County

and the Sacramento Sheriff's Office of improperly manipulating evidence to disadvantage

criminal defendants.  In addition, Sacramento County and the Sacramento Sheriff's Office had a

further longstanding practice, custom, and/or policy of refusing to discipline or otherwise hold

detectives responsible for violations of constitutional rights, which created and maintained a

culture of impunity within the Sheriff Department that encouraged the abuse of constitutional

rights.

91.    For example, in 1996, Charles Edward Case was convicted of a 1993 murder and

robbery.  One of the lead detectives for that case was Stan Reed, the same detective who would

investigate Mr. Galati's murder.  At his trial, Case moved to exclude certain evidence on the

ground that his Fifth Amendment rights were violated when Stan Reed continued to question

Case after he had invoked his *Miranda* rights during an interrogation.  At a 1996 hearing on the

same issue before the trial court, Stan Reed testified under oath that it was his general practice to

continue interrogating suspects even after they invoked their *Miranda* rights.  He further testified

that he did so intentionally to elicit statements that could be used to impeach the witness.

92.    In a 2018 opinion ruling on Case's post-conviction appeal, the California Supreme

Court stated what was already clear at the time of Case's trial—"the general tactic Detective Reed

described is clearly improper."  The Supreme Court also reiterated a sentiment that had been

1  expressed by Justice Baxter in a concurring opinion in *People v. Neal*, 31 Cal.4th 63 (2003), that

2  "Officers must be made aware that they have an absolute obligation to play by the rules when

3  questioning suspects in custody, and that their deliberate failure to do so will be severely

4  disciplined."

5    93.    On April 19, 2021, Jeremy Puckett's counsel submitted a California Public

6  Records Act request to the Sacramento Sheriff's Office ("SD CPRA Request").  The SD CPRA

7  Request requested all records comprising the disciplinary records of Defendants MARCI

8  MINTER, WILLARD BAYLES, LORI GREGERSEN, and Detective Stan Reed.  The

9  Sacramento Sheriff's Office responded that "No responsive documentation exists."  Even though

10 Detective Stan Reed had admitted in open court to intentionally violating citizens' constitutional

11 rights, the Sacramento Sheriff's Office never disciplined him.

12   94.    As another example, in 1995, Kenneth Bernard Turner was found guilty of a 1994

13 murder.  The lead detectives on the case included Stan Reed, Defendant KAY MAULSBY, and

14 Defendant ROBERT BELL.  Turner would subsequently be exonerated and released from

15 incarceration less than a year later when the true perpetrator of the murder was identified.  Before

16 Turner's trial, Turner's counsel moved to exclude evidence obtained by Stan Reed and Defendant

17 ROBERT BELL on the ground that they violated Turner's *Miranda* rights.  Stan Reed and

18 Defendant ROBERT BELL were called to testify.  Stan Reed once again testified that he

19 intentionally continued an interrogation after Turner asserted his right to remain silent and that he

20 employed that method as a "standard practice."  Defendant ROBERT BELL and KAY

21 MAULSBY interrogated Turner in the process of arresting him, entirely failing to inform him of

22 his *Miranda* rights.

23   95.    As in the investigation of Edward Case, Detective Stan Reed admitted in open

24 court that his standard practice was to violate citizens' constitutional rights.  Once again, the

25 Sacramento Sheriff's Office never disciplined him.  On information and belief, the Sacramento

26 Sheriff's Office also never disciplined Defendants ROBERT BELL or KAY MAULSBY.

27   96.    As yet another example, Richard Alex Williams was convicted in 1998 of a 1996

28 murder.  Like in the Galati Investigation, the lead detectives were Defendant MARCI MINTER

and Detective Stan Reed.  The murder had been committed as a drive-by shooting, with witnesses reporting that the perpetrator was wearing a green shirt at the time.  When Defendant MARCI MINTER and Detective Stan Reed showed an eyewitness photographs for identification purposes, they had numerous photographs of Williams to choose from.  They opted to withhold from the witness every picture of Williams except for the one in which he worse a green shirt.  In contrast, none of the other individuals included in the photograph line-up were depicted wearing a green shirt.  Notwithstanding their manipulation of the lineup, Defendant MARCI MINTER and Detective Stan Reed were never disciplined.

97.     The full extent of the Sacramento Sheriff's Office's pattern of civil rights abuses in the years leading up to Jeremy Puckett's wrongful conviction has been obscured by Sacramento County's, the Sacramento District Attorney's Office's, and the Sacramento Sheriff's Office's utter indifference to monitoring Sheriff Department employees to ensure that they respect constitutional rights.

98.     On March 20, 2021, Jeremy Puckett's counsel submitted a California Public Records Act request to the Sacramento County Counsel ("CC CPRA Request").  The CC CPRA Request requested, among other items, writings constituting claims, settlement agreements, or court pleadings received or filed between January 1, 1990 and December 31, 2005 that alleged Sacramento County, the Sacramento District Attorney's Office, or the Sacramento Sheriff's Office committed prosecutorial misconduct, including violations of *Brady v. Maryland*.  The Sacramento County Counsel forwarded this request to the Sacramento Sheriff's Office on March 24, 2021.

99.     The Sacramento Sheriff's Office responded to the CC CPRA Request with a blanket statement that "The record you asked for does not exist."

100.     The Sacramento County Counsel responded to the CC CPRA Request by producing a single spreadsheet that it described as reflecting data from claim forms submitted to the County of Sacramento's Clerk of the Board of Supervisors to seek compensation from Sacramento County.  *See* Complaint Exhibit C (the "Claim Spreadsheet").  Rows 8 through 680 of the Claim Spreadsheet correspond to compensation claims that were made against a

Sacramento County agency between 1995 and 2005. The County Counsel indicated that the claims were "possible matches" to the prosecutorial misconduct claim information that Jeremy Puckett's counsel had requested. The County also indicated that it did not retain any of the underlying writings that the spreadsheet data was drawn from.

101.   Based on the County Counsel's representations, the Claim Spreadsheet does not include misconduct claims that were made in litigation complaints filed in court without submission of a corresponding claim form to Sacramento County. Nor does the Claim Spreadsheet reflect any *Brady* violation findings or other prosecutorial misconduct findings that arose in the course of criminal prosecutions but did not result in a defendant submitting a compensation claim form. On information and belief, neither the Sacramento Sheriff's Office, the Sacramento District Attorney's Office, nor Sacramento County had, between 1990 and 2005, a system for tracking allegations or findings of prosecutorial misconduct, including *Brady* violations, that were not submitted to the County via a compensation claim form.

102.   Of the incomplete set of misconduct allegations reflected in the Claim Spreadsheet, 444 claims were against the Sacramento Sheriff's Office. Of those Sacramento Sheriff's Office claims, 314 alleged that the Sacramento Sheriff's Office caused an injury between January 1, 1995 and Jeremy Puckett's sentencing on March 14, 2002. Each Claim Spreadsheet row has a field in which a Sacramento County employee filled in a shorthand "Loss Cause Description" field (e.g., "Civil Rights Violation," "False Arrest") as well as a longer "Loss Description" field (e.g., "Illegally detained in jail and deprived of daily visit and housing."). The claim descriptions, however, demonstrate Sacramento County and the Sacramento Sheriff's Office's utter lack of concern for tracking and redressing allegations of misconduct.

103.   Even for claims that resulted in a significant payout or settlement by Sacramento County, many of the "claim descriptions" are incomprehensible or fail to describe the nature of the alleged misconduct. For example, a 1995 claim that resulted in a settlement payment of $35,000 and incurred over $179,898 in legal fees for the county (Row 19) is described in the Loss Cause Description, only as "Improp.Perf.Man" and in the supposedly more detailed Loss Description field only as "Improper Performance/Mandate/ Duty." Another 1995 claim that

resulted in a payment of $300,000 and incurred over $252,059 in legal fees for the county (Row 17) is described as "Civil Rights Vi" with no information provided for the "Loss Description." Indeed, of the 314 claims against the Sacramento Sheriff's Office that pre-date March 14, 2002, the Claim Spreadsheet indicates that Sacramento County agencies did not bother recording a Loss Description for 128 of them.

104.    Moreover, of the 79 claims pre-dating March 14, 2002 that are identified as Civil Rights Violations in the Loss Cause Description field, 40 have no Loss Description at all, while others contain non-substantive Loss Descriptions like "Civil Rights," "Civil Rights Violation," or "Police Misconduct."  That is, notwithstanding Sacramento County's recognition that these claims alleged violations of civil rights, these agencies made no effort to track the substance of those allegations for the vast majority of claims.

105.    On information and belief, the Claim Spreadsheet's data was entered by Sacramento County employees contemporaneously with Sacramento County's receipt of compensation claim forms.  That data reflected the entirety of Sacramento County, the Sacramento District Attorney's Office, and the Sacramento Sheriff's Office's efforts to holistically track allegations of misconduct against the Sacramento Sheriff's Office.  Those entities' self-evidently incomplete and careless approach to tracking misconduct allegations is consistent with, and contributed to, Sacramento County's and the Sacramento Sheriff's Office's practice, custom, and/or policy of refusing to discipline or otherwise hold detectives responsible for violations of citizens' rights.

106.    On information and belief, a substantial number of the incompletely recorded claims for civil rights violations against the Sacramento Sheriff's Office reflected in the Claim Spreadsheet were based on allegations of evidence manipulation, including suppression of exculpatory evidence in violation of *Brady v. Maryland*.

107.    In light of voluminous civil rights claims against Sacramento Sheriff's Office employees and court findings of misconduct by Defendants and Stan Reed, the Sacramento Sheriff's Office's failure to create and maintain *any* disciplinary records for its detectives reflects a deliberate or reckless administrative failure to enact procedural safeguards against evidence

manipulation and suppression.  The absence of such safeguards permitted the Sacramento

Sheriff's Office's longstanding policy, practice, or custom of improperly manipulating evidence

to continue, and tacitly encouraged it by failing to hold detectives accountable for misconduct.

108.    As a result of these administrative failures, the Sacramento Sheriff's Office's

longstanding policy, practice, or custom of improperly manipulating evidence persisted after

Jeremy Puckett's wrongful arrest, prosecution, and conviction.

109.    For example, in 2008, the Sacramento Sheriff's Office carried out a drug sting

during which officers claimed to have seen John Pruitt and Darryl Berg's car in the area, had

them pulled over and arrested without investigation or evidence to show they were involved in

drug dealing, and then covered up their mistake by suppressing evidence.  To defend themselves

in court, the men had asked for tape recording from the sting operation.  Sheriff's deputies

involved in the sting testified under oath that no such tapes existed.  On the eve of trial, however,

prosecutors revealed that the tapes did exist, and that they showed the task force had no probable

cause to arrest Pruitt and Berg.  Once the suppressed tapes came to light—fourteen months after

Pruitt and Berg's arrests—the charges were thrown out.

110.    In Jeremy Puckett's case, the Individual Sheriff Defendants acted in a manner

consistent with the Sacramento Sheriff's Office's longstanding policy, practice, or custom of

improperly manipulating evidence by selectively suppressing voluminous exculpatory evidence

that bore on a third-party culpability defense, the thoroughness and good faith of the state's

investigation, and the credibility of prosecution witnesses.

111.    The Individual Sheriff Defendants' willingness to suppress such a large amount of

exculpatory evidence is unsurprising in light of the Sacramento Sheriff's Office's other

longstanding policy, practice, or custom of refusing to discipline or otherwise hold detectives

responsible for violations of citizens' rights.  On many occasions in the years leading up to

Jeremy Puckett's arrest and conviction, the same detectives that investigated and compiled the

evidence against Jeremy Puckett intentionally violated other defendants' civil rights.  In many

cases, they even admitted that they had done so.  Yet the Sacramento Sheriff's Office refused to

discipline them.  The culture of impunity that arose as a result of the Sacramento Sheriff's

Office's policy, practice, or custom emboldened its detectives to disregard civil rights and pursue convictions at all costs. This ultimately resulted in the Individual Sheriff Defendants' violation of Jeremy Puckett's rights, which caused his wrongful conviction and incarceration.

### VII.   The Sacramento District Attorney's Office's Customary Indifference to Prosecutorial Misconduct Gave Rise to a Culture of Impunity

112.   Jeremy Puckett's wrongful conviction was also directly and proximately caused by longstanding and unconstitutional policies, practices, and/or customs of Sacramento County and the Sacramento District Attorney's Office. By the time of the prosecution of Jeremy Puckett, a longstanding practice, custom, and/or policy had arisen within Sacramento County and the Sacramento District Attorney's Office of selectively withholding exculpatory evidence relevant to criminal prosecutions from defense teams. In addition, Sacramento County and the Sacramento District Attorney's Office had a further practice, custom, and/or policy of refusing to discipline or otherwise hold prosecutors responsible for violations of citizens' rights, which created and maintained a culture of impunity within the Sacramento District Attorney's Office.

113.   By the time of Jeremy Puckett's prosecution and conviction, these policies, practices, and/or customs had already manifested in multiple high-profile cases. Particularly when prosecutors' cases relied in large part upon a single important witness, as in Jeremy Puckett's case, Sacramento District Attorney's Office employees routinely withheld exculpatory information related to the witnesses' credibility.

114.   For example, in 1986, Gloria Killian was convicted of participating in a 1981 murder and robbery. The prosecution's *only* direct evidence against Killian was the testimony of Gary Masse, who—after being convicted of participating in the murder and sentenced to life without possibility of parole—had contacted the Sacramento Sheriff's Office to see if any deals could be struck. Assured by the Sacramento Sheriff's Office that the state would be willing to assist in a sentence reduction, Masse implicated Killian and testified at her trial in 1986. The Sacramento District Attorney's Office prosecutors, however, had suppressed material exculpatory evidence that bore on the motives and credibility of the prosecution's central witness, including multiple letters from Masse that evidenced his motives for testifying against Killian. Killian

raised this issue in a habeas petition.  In a March 13, 2002 decision directing the district court to grant Killian's petition, the Ninth Circuit held that Sacramento District Attorney's Office prosecutors violated Killian's *Brady* rights by withholding impeachment evidence from the defense team.

115.    As another example, in 1990, James Majors was convicted of committing a 1989 triple-murder.  One of the prosecution's witnesses was Bonnie Hogue, who placed Majors in Sacramento at the time of the murders and testified about his actions in the time period immediately following the murders.  But prosecutors had violated Majors' *Brady* rights by suppressing evidence of Hogue's memory problems, including that she was frequently unable to remember events without prompting and that she had memory blackouts and visual and aural hallucinations.  Majors raised these rights violations in subsequent habeas petition filings.  A federal magistrate judge ultimately determined that Majors had presented a *prima facie* case supporting a *Brady* violation, but Majors passed away before his habeas petition proceedings could progress further.  As with Jeremy Puckett, the evidence suppressed in Majors' case concerned a critical prosecution witness.  The magistrate judge found that Hogue's testimony was important because the prosecution presented no evidence directly tying Majors to the scene of the crimes or the murder weapons, and instead relied on testimony about Major's actions before and after the crimes.  Without Hogue's testimony, the prosecution's case would have consisted of little more than the facts that Major travelled to Sacramento with a man whose name was found at the crime scene.

116.    In yet another example, in 2002, Jeffrey Ford was convicted of committing multiple bank robberies in the year 2000.  At Ford's trial, the key witness was Connie Goins, who testified that Ford had admitted to her that he robbed multiple banks.  Prosecutors had failed to disclose to Ford's defense team exculpatory evidence of benefits that Goins received for testifying, which included avoiding incarceration in multiple cases against her.  Ford raised this issue in a subsequent habeas petition.  A district court ultimately found, and a divided Ninth Circuit panel affirmed, that Ford could have discovered this *Brady* violation at trial through due diligence, which time-barred his claim.  As noted by the dissenting Ninth Circuit judge, however,

there was no dispute that Sacramento District Attorney's Office prosecutors failed to disclose the benefits that Goins received in exchange for testifying.

117.     The Sacramento District Attorney's Office's longstanding policy, practice, or custom of withholding exculpatory information from criminal defendants was encouraged and facilitated by administrative failures to enact proper procedural safeguards against *Brady* violations.  The absence of such safeguards permitted this policy, practice, or custom to continue, and tacitly encouraged it by failing to hold prosecutors accountable for prosecutorial misconduct.

118.     On June 4, 2021, Jeremy Puckett's counsel sent a California Public Records Act request to the Sacramento District Attorney's Office ("DA CPRA Request").  The DA CPRA Request requested, among other items, writings constituting claims or court pleadings received or filed between January 1, 1990 and December 31, 2005 that alleged Sacramento County, the Sacramento District Attorney's Office, or the Sacramento Sheriff's Office committed prosecutorial misconduct, including violations of *Brady v. Maryland*.  The Sacramento District Attorney's Office responded that it did not have an index that identifies that information, and that the agency would have to hand-search individual employees' files for such information, which it refused to do.  Based on its refusal to search employee files for the requested writings, the Sacramento District Attorney's Office's response identified *only one* criminal or civil case alleging in pleadings that Sacramento County, the Sacramento District Attorney's Office, or the Sacramento Sheriff's Office committed prosecutorial misconduct between 1990 and 2005—Jeremy Puckett's own habeas petition filing.

119.     On information and belief, in the years leading up to and following Jeremy Puckett's wrongful prosecution and conviction, Sacramento County and the Sacramento District Attorney's Office, through its policymakers, deliberately or recklessly failed to monitor its employees' failure to disclose exculpatory information.  Sacramento County and the Sacramento District Attorney's Office failed to or chose not to centrally track and record alleged *Brady* violations, or to otherwise perform any review of agency employees' alleged failures to comply with their *Brady* obligations.  This administrative failure to monitor *Brady* violations reflected and maintained those entities' practice, custom, and/or policy of refusing to discipline or

1  otherwise hold prosecutors responsible for violations of citizens' constitutional rights.

2  120.    The DA CPRA Request also requested writings constituting settlement

3  agreements, jury verdict forms or civil case judgements pertaining to claims that, between

4  January 1, 1990 and December 31, 2005, Sacramento County, the Sacramento District Attorney's

5  Office, or the Sacramento Sheriff's Office committed prosecutorial misconduct, including

6  violations of *Brady v. Maryland*.  The Sacramento District Attorney's Office responded that it did

7  not have an index that identifies that information, and would have to hand-search individual

8  employees' files for such information.

9  121.    On information and belief, in the years leading up to and following Jeremy

10  Puckett's wrongful prosecution and conviction, Sacramento County and the Sacramento District

11  Attorney's Office, through its policymakers, deliberately or recklessly failed to monitor civil

12  judgments and settlements that found Sacramento District Attorney's Offices had committed

13  prosecutorial misconduct, including *Brady* violations.  This administrative failure demonstrated

14  Sacramento County's and the Sacramento District Attorney's Office's indifference to *Brady*

15  violations, and thereby tacitly encouraged the policy, practice, or custom of withholding

16  exculpatory information from criminal defendants.  It also reflected Sacramento County's and the

17  Sacramento District Attorney's Office's practice, custom, and/or policy of refusing to discipline

18  or otherwise hold prosecutors responsible for violations of citizens' rights.

19  122.    These administrative failures of Sacramento County and the Sacramento District

20  Attorney's Office to track allegations, settlements, and judicial findings are also reflected in those

21  agencies' utter indifference to properly recording and responding to claims alleging civil rights

22  violations by Sacramento District Attorney's Office prosecutors.  Of the incomplete set of

23  misconduct allegations reflected in the Claim Spreadsheet, 46 were claims against the Sacramento

24  District Attorney's Office.  Thirty-six of those claims alleged that the agency committed

25  misconduct between January 1, 1995 and Jeremy Puckett's sentencing on March 14, 2002.

26  Sacramento County's data collection for claims against the Sacramento District Attorney's Office

27  demonstrates Sacramento County and the Sacramento District Attorney's Office's utter lack of

28  concern for tracking and redressing allegations of misconduct.

123.    Even for claims that resulted in a significant payout or settlement by Sacramento County, many of the "claim descriptions" are incomprehensible or fail to describe the nature of the alleged misconduct.  For example, a 1995 claim that resulted in a settlement payment of $15,000 and incurred $11,035 in legal fees for the county (Row 80) is described, in the Loss Cause Description, as "False Arrest," with no information provided for the "Loss Description." Seventeen of the claims that pre-date Jeremy Puckett's sentencing have a Loss Cause Description of "Civil Rights Vi" or "Denial/Viol. Civ," yet many have no "Loss Description" entries, while others contain non-substantive loss descriptions like "Clmt said his Civil Rights were violated." That is, notwithstanding Sacramento County's recognition that these claims alleged violations of civil rights by the Sacramento District Attorney's Office, these agencies made no effort to track the substance of those allegations for the vast majority of claims.

124.    On information and belief, this data reflected the entirety of Sacramento County and the Sacramento District Attorney's Office's efforts to holistically track allegations of misconduct against the Sacramento District Attorney's Office.  Those entities' self-evidently incomplete and careless approach to tracking misconduct allegations is consistent with, and contributed to, Sacramento County's and the Sacramento District Attorney's Office's practice, custom, and/or policy of refusing to discipline or otherwise hold prosecutors responsible for violations of citizens' constitutional rights.

125.    On information and belief, a substantial number of the incompletely recorded claims for civil rights violations against the Sacramento District Attorney's Office reflected in the Claim Spreadsheet were based on allegations of suppression of exculpatory evidence in violation of *Brady v. Maryland*.

126.    In the course of investigating Jeremy Puckett's case, Defendant MARJORIE DURENBERGER acted in a manner consistent with Sacramento County's and the Sacramento District Attorney's Office's longstanding policy, practice, or custom of withholding exculpatory information from criminal defendants.  Her deliberate suppression of impeachment evidence that bore on the credibility of Israel Sept, the key prosecution witness against Jeremy Puckett, closely parallels the methods employed by Sacramento District Attorney's Office prosecutors in other

COMPLAINT AND JURY TRIAL DEMAND                                                              35

cases, including those against Gloria Killian, James Majors, and Jeffrey Ford. Her willingness to violate Jeremy Puckett's rights came about as a result of the culture of impunity created by the Sacramento District Attorney's Office's practice, custom, and/or policy of refusing to discipline or otherwise hold prosecutors responsible for violations of citizens' constitutional rights.

## VIII.  Sacramento County's Failure to Oversee and Properly Administer Law Enforcement Agencies

127.    The foregoing allegations make clear that, in the years leading up to Jeremy Puckett's wrongful conviction and incarceration, Sacramento County had longstanding practices, customs, and/or policies of failing to monitor and take disciplinary action to redress violations of citizens' constitutional rights committed by county employees across multiple law enforcement agencies.

128.    Sacramento County abdicated its responsibility to monitor whether county employees at the Sacramento Sheriff's Office or Sacramento District Attorney's Office were violating citizens' constitutional rights, and failed to ensure that employees who violated constitutional rights were appropriately disciplined. For the most part, Sacramento County, by and through its policymakers, simply ignored allegations and findings of misconduct against these agencies by only tracking allegations made in compensation claim forms submitted to the county's Clerk of the Board of Supervisors. In doing so, Sacramento County failed to even track allegations from court pleadings that were not submitted on a corresponding claim form, as well as *Brady* violation findings or other prosecutorial misconduct findings that arose in the course of criminal prosecutions but did not result in submission of a compensation claim.

129.    For the very limited subset of prosecutorial misconduct allegations that it purported to monitor, Sacramento County displayed an utter indifference to properly recording and responding to claims alleging civil rights violations by Sacramento Sheriff's Office detectives and Sacramento District Attorney's Office prosecutors. Even for claims that resulted in significant settlement payouts and/or incurred significant legal expenses for the county, Sacramento County recorded little or no information about the misconduct allegations. For the overwhelming majority of claims alleging misconduct between January 1, 1995 and March 14,

2002, Sacramento County failed to track *any* substantive information about the alleged rights violations.  This occurred notwithstanding Sacramento County's recognition that the claims alleged civil rights violations.  On information and belief, this data reflected the entirety of Sacramento County's efforts to holistically track allegations of misconduct against Sacramento County employees.

130.    Consistent with its indifference to monitoring constitutional rights violations, Sacramento County also failed to ensure that the Sacramento Sheriff's Office and Sacramento District Attorney's Office were monitoring allegations and findings of prosecutorial misconduct. Even where Sacramento County employees admitted to intentionally violating citizens' constitutional rights, Sacramento County failed to take any efforts to ensure that those employees were disciplined.

131.    In addition to the agency-specific policies, patterns, and/or customs of Sacramento County, the Sacramento Sheriff's Office, and the Sacramento District Attorney's Office described above, Jeremy Puckett's wrongful conviction and incarceration were caused by Sacramento County's broader policy, practice, or custom of failing to monitor and discipline county employees who violated constitutional rights.  On many occasions in the years leading up to Jeremy Puckett's arrest and conviction, Sacramento County detectives and prosecutors manipulated evidence to disadvantage criminal defendants, including by suppressing exculpatory evidence in violation of *Brady v. Maryland*.  Yet those county law enforcement employees were not disciplined, and Sacramento County largely failed to even monitor their misconduct.  The culture of impunity that arose as a result of this policy, practice, and/or custom emboldened detectives and prosecutors to disregard constitutional rights and pursue convictions at all costs. This ultimately resulted in the Individual Defendants' violations of Jeremy Puckett's rights, which caused his wrongful conviction and incarceration.

## DAMAGES

132.    As a proximate result of Defendants' violation of his constitutional rights, Jeremy Puckett was injured and damaged, including but not limited to his loss of income, mental anguish and humiliation, emotional distress, and loss of reputation.

133.    Jeremy Puckett found it necessary to engage the services of private counsel to vindicate his rights under the law.  Jeremy Puckett is entitled to an award of reasonable attorneys' fees and/or costs pursuant to statute(s) in the event that he is the prevailing party in this action under 42 U.S.C. Sections 1983 and 1988.

134.    The Defendants' conduct was malicious, wanton, oppressive, motivated by an evil motive or intent, and demonstrated reckless and callous indifference to Jeremy Puckett's constitutional rights.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983 (*Brady* Violations)

135.    Plaintiff hereby re-alleges and incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges:

136.    Defendants MARCI MINTER, WILLARD BAYLES, LORI GREGERSEN, KAY MAULSBY, ROBERT BELL, and DOES 1 through 50, acting under color of state law, deprived Jeremy Puckett of his right to a fair trial by withholding material evidence that was favorable to Jeremy Puckett's defense from prosecutors and the trial defense team, including but not limited to substantial evidence of third party culpability contained in the Sacramento Sheriff's Office's Dvorsky Investigation file, thereby violating Jeremy Puckett's Fourteenth Amendment rights.

137.    Defendants MARCI MINTER, WILLARD BAYLES, LORI GREGERSEN, KAY MAULSBY, ROBERT BELL, and DOES 1 through 50, had knowledge that this evidence existed, had knowledge that it was exculpatory, and either directly participated in or knew about its suppression.  Their actions were taken with deliberate indifference and/or reckless disregard for Jeremy Puckett's rights, as they were aware that the suppression of this material, exculpatory evidence would violate Jeremy Puckett's constitutional rights under clearly established law at the time.  No reasonable detective would have believed this conduct was lawful in 2002.

138.    Defendant MARJORIE DURENBERGER and DOES 1 through 50, acting under color of state law, deprived Jeremy Puckett of his right to a fair trial by withholding material

evidence that was favorable to Jeremy Puckett from his trial defense team, including but not limited to substantial evidence that could have been used to impeach critical trial witnesses, thereby violating Jeremy Puckett's Fourteenth Amendment rights.

139.    Defendant MARJORIE DURENBERGER and DOES 1 through 50 had knowledge that this evidence existed, had knowledge that it was exculpatory, and either directly participated in or knew about its suppression.  Their actions were taken with deliberate indifference and/or reckless disregard for Jeremy Puckett's rights, as they were aware that the suppression of this material, exculpatory evidence would violate Jeremy Puckett's constitutional rights under clearly established law at the time.  No reasonable prosecutor would have believed this conduct was lawful in 2002.

140.    The criminal case against Jeremy Puckett was weak.  If the jury had been able to hear the evidence suppressed by the individual Defendants, Jeremy Puckett's trial would most likely have had a different result.  Defendants' suppression of evidence therefore harmed Jeremy Puckett by prejudicing his trial defense, directly and proximately causing him to be wrongfully arrested, prosecuted, and convicted.

## SECOND CAUSE OF ACTION

### Violation of the Due Process Clause of the Fourteenth Amendment under 42 U.S.C. § 1983 (Fabrication of Evidence)

141.    Plaintiff hereby re-alleges and incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges:

142.    Defendant DR. DONALD HENRIKSON, and DOES 1 through 50, acting under color of state law, intentionally or recklessly created false evidence that placed the time of Mr. Galati murder at no earlier than the morning of Saturday March 14, 1998, approximately 24 hours after Mr. Galati's death.  DR. DONALD HENRIKSON, and DOES 1 through 50, subsequently communicated this false information to Sacramento Sheriff's Office detectives and Sacramento District Attorney's Office prosecutors working on the Galati Investigation and Puckett prosecution, which had a material effect on the subsequent investigation and prosecution of Jeremy Puckett.

143.    Defendant DR. DONALD HENRIKSON's false time-of-death conclusion was the result of a shoddy scientific method unsupported by the standards of forensic pathology.  He intentionally chose not to consider or recklessly failed to consider numerous factors relevant to estimating time of death, and drew unsupported inferences from those factors that he did observe.

144.    After fabricating false evidence and communicating that evidence to detectives and prosecutors, Defendant DR. DONALD HENRIKSON became aware of other evidence that would be presented at Mr. Puckett's trial, and that such evidence indicated that Mr. Galati had been killed on March 13, 1998 rather than March 14, 1998.  With either intentional or reckless disregard for the truth, Defendant DR. DONALD HENRIKSON disregarded this conflicting evidence and reasserted his initial false conclusions to prosecutors working on Jeremy Puckett's case.  Defendant DR. DONALD HENRIKSON would ultimately testify to his false time-of-death conclusion at Jeremy Puckett's trial.

145.    Defendant DR. DONALD HENRIKSON was aware that deliberately or recklessly fabricating false evidence and communicating that evidence to detectives and prosecutors would violate Jeremy Puckett's constitutional rights under clearly established law at the time.  No reasonable forensic pathologist would have believed this conduct was lawful in 2002.

146.    There is a reasonable likelihood that Defendant DR. DONALD HENRIKSON's fabrication of evidence affected the course of the Individual Sheriff Defendants' investigation, the Sacramento District Attorney's Office's decision to prosecute, and the jury's verdict at Jeremy Puckett's trial, as his false report caused both agencies to discount Jeremy Puckett's strong alibi evidence and ignore other suspects.  As a direct and proximate result of DR. DONALD HENRIKSON's actions, Jeremy Puckett was wrongly arrested, prosecuted, and convicted.

## THIRD CAUSE OF ACTION

### Sacramento County and Sacramento Sheriff's Office Municipal Liability for Unconstitutional Custom or Policy (*Monell*) under 42 U.S.C. § 1983

147.    Plaintiff hereby re-alleges and incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges:

148.    As of Jeremy Puckett's arrest and prosecution, Sacramento County and the

Sacramento Sheriff's Office, by and through its policymakers, had developed, created, and maintained a longstanding policy, practice, and/or custom of improperly manipulating evidence to disadvantage criminal defendants.

149.    In addition, as of Jeremy Puckett's arrest and prosecution, Sacramento County and the Sacramento Sheriff's Office, by and through its policymakers, had developed, created, and maintained a longstanding policy, practice, and/or custom of refusing to discipline or otherwise hold detectives responsible for violations of citizens' rights.

150.    Moreover, Sacramento County, by and through its policymakers, had developed, created, and maintained a longstanding policy, practice, and/or custom of refusing to discipline or otherwise hold any law enforcement employees responsible for violations of citizens' rights.

151.    These unconstitutional policies, practices, and/or customs of Sacramento County and the Sacramento Sheriff's Office were maintained and encouraged by Sacramento County's and the Sacramento Sheriff's Office's administrative failures to comprehensively monitor and address (i) formal claims or court filings alleging *Brady* violation by Sacramento Sheriff's Office employees, (ii) settlement agreements pertaining to allegations of *Brady* violations by Sheriff employees, or (iii) civil judgments reflecting findings of *Brady* violations by Sacramento Sheriff's Office employees.  They were further maintained and encouraged by those entities' refusal to discipline even those Sacramento Sheriff's Office employees who admitted to violations of citizens' rights.

152.    These unconstitutional policies, practices, and/or customs of Sacramento County and the Sacramento Sheriff's Office amounted to deliberate indifference to Jeremy Puckett's rights.  They have also manifested in numerous cases other than Jeremy Puckett's, including but not limited to cases against Charles Case, Kenneth Turner, and Richard Williams.

153.    The deprivation of Jeremy Puckett's rights by the Individual Sheriff Defendants, as described above, conformed to and was proximately caused by these policies, practices, and/or customs, which were the moving force behind the Individual Sheriff Defendants' violation of Jeremy Puckett's rights.

**FOURTH CAUSE OF ACTION**

**Sacramento County and Sacramento District Attorney's Office Municipal Liability for Unconstitutional Custom or Policy (*Monell*) under 42 U.S.C. § 1983**

154.    Plaintiff hereby re-alleges and incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges:

155.    As of Jeremy Puckett's arrest and prosecution, Sacramento County and the Sacramento District Attorney's Office, by and through its policymakers, had created and/or maintained a longstanding policy, practice, and/or custom of selectively withholding exculpatory evidence relevant to criminal prosecutions from defense teams.

156.    In addition, as of Jeremy Puckett's arrest and prosecution, Sacramento County and the Sacramento District Attorney's Office, by and through its policymakers, had developed, created, and maintained a longstanding policy, practice, and/or custom of refusing to discipline or otherwise hold prosecutors responsible for violating citizens' rights by selectively withholding exculpatory evidence.

157.    Moreover, Sacramento County, by and through its policymakers, had developed, created, and maintained a longstanding policy, practice, and/or custom of refusing to discipline or otherwise hold any law enforcement employees responsible for violations of citizens' rights.

158.    These unconstitutional policies, practices, and/or customs of Sacramento County and the Sacramento District Attorney's Office amounted to deliberate indifference to Jeremy Puckett's rights.  They have also manifested in cases against numerous individuals other than Jeremy Puckett himself, including but not limited to the high-profile prosecutions of Gloria Killian, James Majors, and Jeffrey Ford.

159.    These unconstitutional policies, practices, and/or customs of Sacramento County and the Sacramento District Attorney's Office were maintained and encouraged by the Sacramento District Attorney's Office's administrative failures to comprehensively monitor and address (i) formal claims or court filings alleging *Brady* violation by Sacramento District Attorney's Office employees, (ii) settlement agreements pertaining to allegations of *Brady* violations by Sacramento District Attorney's Office employees, or (iii)  civil judgments reflecting

1  findings of *Brady* violations by Sacramento District Attorney's Office employees.

2      160.    The deprivation of Jeremy Puckett's rights by the Defendant MARJORIE

3  DURENBERGER, as described above, conformed to and was proximately caused by these

4  policies, practices, and/or customs, which were the moving force behind Defendant MARJORIE

5  DURENBERGER's violation of Jeremy Puckett's rights.

6  **JURY DEMAND**

7      161.    Plaintiff hereby demands a jury trial in this action.

8  **PRAYER**

9      162.    WHEREFORE, Plaintiff prays for judgement against Defendants as follows:

10      a.   For injunctive relief, including but not limited to enjoining Sacramento

11         County, the Sacramento Sheriff's Office, and the Sacramento District

12         Attorney's Office from engaging in unconstitutional policies of evidence

13         suppression, and appointing an independent monitor to supervise and evaluate

14         whether unconstitutional customs, patterns, practices, or policies have stopped;

15      b.   For general compensatory damages in an amount to be determined according

16         to proof at trial;

17      c.   For special damages, including but not limited to, past, present and/or future

18         wage loss, loss of reputation, medical expenses and other special damages in a

19         sum to be determined according to proof;

20      d.   For punitive damages in an amount to be determined according to proof at

21         trial;

22      e.   For costs of suit incurred herein;

23      f.   For attorneys' fees and expert witness fees incurred herein; and

24      g.   For such other and further relief as the Court deems just and proper.

25

26

27

28

1

2

3

Dated:  February 22, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

By: _____
HARRISON J. FRAHN IV

SIMPSON THACHER & BARTLETT LLP
HARRISON J. FRAHN IV (SBN 206822)
JACQUES J. LAMOTHE (SBN 321560)
RYAN SNYDER (SBN 334846)
2475 Hanover Street
Palo Alto, California 94304

NORTHERN CALIFORNIA INNOCENCE
PROJECT
KARYN SINUNU-TOWERY (SBN 121068)
500 El Camino Real
Charney Hall, Suite 108
Santa Clara, California 95053

*Attorneys for Plaintiff Jeremy Phillip Puckett*

COMPLAINT AND JURY TRIAL DEMAND                    44