# EXHIBIT A

FILED / ENDORSED

MAR 3 2020

C

By H. Craun, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

In re: )      Case No. 19HC00385     Dept. 21
)
      JEREMY PUCKETT )      **ORDER GRANTING PETITION FOR**
)      **WRIT OF HABEAS CORPUS**
On Habeas Corpus. )
)

TO:    JEREMY PUCKETT, Petitioner, and Counsel for Petitioner, Northern California Innocence Project, Karyn Sinunu-Towery, Linda Starr, Harrison Frahn, and Jacques Lamothe; and RALPH DIAZ, Secretary of the California Department of Corrections and Rehabilitation, Respondent, and Counsel for Respondent, Richard Miller, Deputy District Attorney and Craig S. Meyers, Deputy Attorney General:

     Petitioner is serving a sentence of life without the possibility of parole. He has

filed a petition for writ of habeas corpus raising several claims. For the reasons set

forth below, it is GRANTED.

//

## I.    BACKGROUND

In case number 01F02675, a jury found Petitioner guilty of the robbery and murder of Anthony Galati and found true the firearm enhancement and special circumstance of murder committed during the commission of a robbery. The jury found Petitioner not guilty of being a felon in possession of a firearm.

On March 14, 2002, the court sentenced Petitioner to 11 years plus life without the possibility of parole.

The conviction and sentence were affirmed on appeal on November 5, 2003. (*People v. Puckett,* 2003 Cal.App.Unpub. LEXIS 10442 (C040743).) The California Supreme Court denied the petition for review on December 16, 2003. (S121183.)

## II.    PRIOR PETITIONS

The superior court, appellate court and Supreme Court denied Petitioner's prior habeas petitions as follows:

05F00323   Denied in Superior Court on February 9, 2005

C049451    Denied in the Court of Appeal, Third Appellate District on
           April 21, 2005

S134641    Denied in the California Supreme Court on May 10, 2006

12HC00552  Denied in the Superior Court on December 12, 2012

C073079    Denied in the Court of Appeal, Third Appellate District on
           February 14, 2013

S210707    Denied on the California Supreme Court on November 20, 2013

16HC00248  Denied in the Superior Court on March 9, 2017

1 | C084586 | Denied in the Court of Appeal, Third Appellate District on July 27, 2017

2

3 | S243964 | Order to Show Cause issued in the California Supreme Court on July 10, 2019

4 ## III.    FACTS

5

6    The body of Anthony Galati was found on March 14, 1998. More than a year

7 later, Israel Sept, then serving a prison sentence in an unrelated case, contacted

8 authorities to say he had information regarding a homicide. On October 5, 1999,

9 detectives interviewed him in prison. Sept told them that he, along with Angela

10 Dvorsky and Petitioner, committed the murder of Anthony Galati. Meanwhile,

11

12 detectives had also been investigating the homicide of Angela Dvorsky, whose body

13 was found in April,1998.

14

15    The evidence, as presented at trial and summarized by the Third District Court

16 of Appeal, follows:

17

    *Testimony of Israel Sept*

18

19    Sept, also known as Easy, met the victim, Anthony Galati, at an Easy Stop store on March 13, 1998.[1] Galati was with Larry Middlebrooks, also known as Richard Pryor, whom Sept knew previously. Sept went with Galati and Middlebrooks to an apartment Middlebrooks shared with William Van Hill. Later, Angela Dvorsky and a man named Jaymo came to the apartment, but Jaymo soon left. Still later, defendant arrived. Sept wanted to sell Middlebrooks and Galati drugs but could not because Galati only had a $ 100 bill and Sept had no change. Middlebrooks and Galati left the apartment and returned twice looking for change, after which Sept sold Middlebrooks some drugs. Middlebrooks and Patty Bostic went into the bathroom. Van Hill was in his bedroom.

20

21

22

23

24

25

26 [1] Respondent now concedes that the date of March 13, 1998, is incorrect. The events

27 at issue began on the evening of March 12, 1998. (See Tx of Evid. Hrg. pp. 17-66, (11/14/2019) [testimony of July Melinek]; and pp. 245-246 (11/15/2019) ["[W]e do not

28 dispute that this killing happened the morning of March 13th of 1998."].)

Sept went to the bathroom to talk to Middlebrooks and sell him additional drugs. At the time, Dvorsky was sitting on Galati's lap in the dining room. When Sept returned from the bathroom, Galati was lying prone on the living room floor. Defendant was standing over Galati with a gun in his hand, demanding money from Galati. Defendant threatened to shoot everyone in the apartment. Sept told him he could not do that and get away with it, then Sept went back to the bathroom to warn its occupants to stay there. As Sept was leaving the bathroom, Van Hill came out of his bedroom. He returned to his bedroom at the urging of Sept and Middlebrooks.

When Sept returned to the living room, Dvorsky was on Galati's back, tying his hands up with two electrical cords, one black and one white. When Dvorsky finished, defendant told Sept, "Come on. Let's go." Sept and defendant lifted Galati to his feet and they left the apartment, with Dvorsky following. They entered the car, putting Galati in the backseat, lying down. Dvorsky laid down on top of him.

Defendant drove the car away from the apartments and eventually to a rural area. Defendant stopped the car and, with Dvorsky's help, took Galati out of the car. Dvorsky got back into the car, and defendant took Galati behind the car. Sept heard two gunshots, after which defendant entered the car and drove to an industrial area where they left the car. They walked to a motel, where Sept checked them in. Sept left the room and went home, leaving defendant and Dvorsky there.

*Other Evidence*

Larry Middlebrooks met Tony Galati at the Easy Market on March 13, 1998. Later that evening, Galati approached Middlebrooks and asked where he could purchase drugs. They went to the apartment shared by Middlebrooks and Van Hill, trying to purchase rock cocaine but unsuccessful because Galati only had a $ 100 bill and no change. They finally purchased rock cocaine elsewhere and both later returned to the apartment.

William Van Hill, Larry Middlebrooks's roommate, had met defendant before March 13, 1998. Sometime after 10:00 p.m. on March 13, 1998, Van Hill went to bed. Defendant, Sept, Dvorsky, Galati, and others were in the apartment at the time. After hearing the noise of someone whimpering, Van Hill came out of the bedroom and told Sept they would have to leave. After Van Hill had gone back to bed, he heard Sept and defendant talking. Again coming out of the bedroom, Van Hill saw Galati and Dvorsky sitting on the floor. Defendant and Sept were aggressively demanding Galati's money and keys. They grabbed Galati by the arms and took him out the front door.

Patty Bostic was at the apartment shared by Middlebrooks and Van Hill on the evening of March 13, 1998, where she saw defendant and others. She went into the bathroom to smoke rock cocaine with Middlebrooks. Twice, Sept came to the door of the bathroom to ask Middlebrooks if Galati had money. She heard

1    scuffling and a man asking someone to stop hitting him. Sept came to the
2    bathroom door and told Bostic and Middlebrooks to stay in there because
     "defendant wants to kill everybody in the house." Bostic heard the front door
3    open. When she later came out of the bathroom, everyone was gone.

4         Galati's body was found on March 14, 1998, along White Rock Road in
     Sacramento County. He had died from two gunshots to the back of his head. His
5    hands were tied behind his back with white and black electrical cords, and his
6    wallet and other valuables were gone. His car was found two days later at a
     nearby apartment complex, fully engulfed in flames. (*Puckett, supra,* 2003
7    Cal.App.Unpub. LEXIS 10442, **1-5.)

8

9    **IV.   DISCUSSION**

10        In the petition filed under case number S243694 Petitioner raised six claims. The

11   court sought informal responses from the parties. On July 10, 2019, the California

12   Supreme Court issued an Order to Show Cause regarding three of the claims:

13

14        "The Secretary of the California Department of Corrections and Rehabilitation is
          ordered to show cause before the Sacramento County Superior Court, when the
15        matter is placed on calendar, why relief should not be granted on the grounds
          that the prosecution withheld material exculpatory evidence from the defense
16        (see *Brady v. Maryland* (1963) 373 U.S. 83), that trial counsel's failure to
17        introduce exculpatory statements by prosecution witness Israel Sept violated
          petitioner's right to the effective assistance of counsel, and that petitioner has
18        come forward with new evidence that he is innocent of the charges (see Pen.
          Code, § 1473, subd. (b)(3)(A)). The return must be served and filed on or before
19        August 9, 2019."

20        Respondent did not file a return by the due date and the court denied

21   Respondent's untimely request for an extension of time. "Any material allegation of the
22
     petition not controverted by the return is deemed admitted for purpose of the
23
     proceeding." (Cal. Rules of Court, rule 4.551(d).) The court held an evidentiary hearing
24
25   on November 14 and 15, 2019, and the parties filed numerous supplemental
26   pleadings both before and following that hearing.

27

28

## A.    The Prosecution Withheld Material Exculpatory Evidence from the Defense

In the verified petition filed in the California Supreme Court on August 25, 2017, Petitioner contends Respondent withheld numerous documents in violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). (Pet. pp. 54-64.)

Additionally, during the course of the present litigation, Petitioner filed a supplemental pleading alleging additional documents recently unearthed which Petitioner contends Respondent withheld in violation of *Brady*. (See "Declaration of Karyn Sinunu-Towery," filed 11/21/2019.) Respondent concedes they have no record to show they provided a vast majority of the named documents. (See "Respondent's Supplemental Pleading re Identification of Credibility Issues," filed 11/21/2019.)

The prosecutor in a criminal case "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." (*Berger v. United States* (1935) 295 U.S. 78, 88.)

The government has a "duty under the due process clause [of the Fifth and Fourteenth Amendments] to insure that 'criminal trials are fair' by disclosing evidence favorable to the defendant[.]" (*Weatherford v. Bursey* (1977) 429 U.S. 545, 559 quoting *Brady, supra,* 373 U.S. 83.) "Indeed, the State's inherent information-gathering advantages suggest that if there is to be any imbalance in discovery rights, it should work in the defendant's favor." (*Wardius v. Oregon* (1973) 412 U.S. 470, 475, fn. 9.)

*Brady* obligations are self-executing, triggered by the initiation of the adversarial process and the prosecutor has an ongoing duty to learn of any exculpatory evidence known to others acting on the government's behalf. (*Kyles v. Whitely* (1995) 514 U.S. 419, 437 (*Kyles*).) "Pursuant to *Brady*, the prosecution must disclose material exculpatory evidence whether the defendant makes a specific request, a general request, or none at all[.]" (*In re Brown* (1998) 17 Cal.4th 873, 879 (citations omitted.) Under *Brady*, the prosecutor's duty extends to evidence "known to the others acting on the government's behalf." (*Kyles, supra*,  514 U.S. at p. 437.)

When the reliability of a witness may be determinative of guilt or innocence the non-disclosure of evidence affecting credibility justifies a new trial irrespective of good faith or bad faith of the prosecution. (*Giglio v. United States* (1972) 405 U.S. 150, 153.)

"Evidence is material if there is a reasonable probability its disclosure would have altered the trial result. Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132–1133 (citations omitted) (*Zambrano*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390.) For *Brady* purposes, evidence is favorable if it helps the defense or hurts the prosecution, as by impeaching a prosecution witness. (*United States v. Bagley* (1985) 473 U.S. 667, 676 (*Bagley*).).

Finally, "because a constitutional violation occurs only if the suppressed evidence was material by these standards, a finding that *Brady* was not satisfied is

reversible without need for further harmless-error review." (*Zambrano, supra,* 41 Cal.4th at p. 1133, citing *Kyles, supra,* 514 U.S. at p. 435.)

Accordingly, when preparing for trial, the United States Supreme Court urges prosecutors to err on the side of caution.

> "Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." (*United States v. Agurs* (1976) 427 U.S. 97, 108.)

Twenty years later, the Court reemphasized its ruling:

> "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. The prudent prosecutor will resolve doubtful questions in favor of disclosure. This is as it should be." (*Kyles, supra,* 514 U.S. at p. 439 (citations omitted).)

Petitioner alleges Respondent withheld over 700 pages of material exculpatory evidence. Respondent concedes a vast majority of the referenced evidence was withheld.

The question for this Court is whether the evidence withheld is exculpatory or favorable to Petitioner.

It is.

Petitioner alleges two general categories of suppressed evidence: 1) evidence of third-party culpability and 2) impeachment evidence regarding the prosecution's main witness, Israel Sept.

No physical evidence linked Petitioner to the crime or the crime scene. The prosecution's case rested solely on purported eye-witness testimony.

The victim's body was found on March 14, 1998. Investigators were unable to solve the crime. More than a year later, Israel Sept, imprisoned for an unrelated offense, contacted law enforcement to relay information about an unsolved murder. He told detectives that Petitioner murdered Anthony Galati. Sept further identified several individuals he said were present in an apartment central to the crime on the night of the murder. Detectives then interviewed those individuals, except Angela Dvorsky, who had herself been killed six weeks after the Galati murder, and James "Jaymo" Reeves. The bulk of third-party culpability evidence withheld by the prosecution involves Dvorsky and Jaymo.

Sept testified that Petitioner and Dvorsky robbed the victim; that Dvorsky bound him with electrical cord, and then Dvorsky, Sept and Petitioner transported the victim to a rural area where Petitioner shot him.

In the appellate Court's summary of facts Jaymo was mentioned only in passing. According to Sept, Jaymo was at the apartment just a short time on the evening of the murder.

However, the suppressed evidence demonstrates Dvorsky and Jaymo were connected and that they committed robberies together. For example, in a suppressed interview Jean Porterfield indicated to detectives that Dvorsky and Jaymo committed robberies together. (Pet. Exh. 30.) In a statement disclosed to Petitioner before trial, William Dean Brown told detectives that Dvorsky told him that she had "hooked up with a couple of guys" who were into strong arm robberies. (Pet. Exh. 9.) According to Brown, these were "guys" Dvorsky was "staying" with. (*Id.*) Shortly before her death,

Dvorsky told Brown about a robbery with the "guys" she was staying with wherein one of them panicked and shot the victim. (*Id.*) In a suppressed interview, Ontario Grant informed detectives that Dvorsky was staying with Jaymo during February of 1998. (Pet. Exh. 29.) In another suppressed interview Tillman Douglas informed detectives that in February and "maybe March" of 1998, Dvorsky was staying with Jaymo. (Pet. Exh. 32.)

Apart from the deceased Dvorsky, detectives contacted every individual present in the apartment on the night of the murder, except James "Jaymo" Reeves. Detectives "did not interview Jaymo, ascertain whether he had an alibi, or compare physical evidence (such as latent fingerprints) to him." (Pet. p. 13.)

Additionally, the prosecution suppressed evidence that Petitioner had no connection to Dvorsky. The trial court denied Petitioner's pretrial request to present the testimony of Dvorsky's friend, Amber Vadner. Through Vadner, Petitioner sought to establish that he did not know Dvorsky. (Pet. Exh. 69, pp. 44-55 (pp. 1792-1803).) Vadner indicated that Dvorsky knew a Jeremy Caldera and "the other Jeremys, there was a few Jeremys she hung out with…I don't know their last names". (*Id.* at p. 50 (p. 1798).)

Years after the trial, Petitioner discovered that the prosecutor failed to disclose hundreds of pages comprising Dvorsky's journal, letters, and a day planner from the relevant time frame. (Pet. Exh. 28.)

In these pages appear 121 men's names (excluding the names of Dvorsky's father and son) including the name Jeremy Marshall, and a Jeremy not referenced

with a last name. The name of no male appears more frequently and prominently than Jaymo.

Another discovery issue presented when reference was made to Dvorsky's murder in the prosecutor's opening statement at trial: that she was stabbed and found in the river. Outside the presence of the jury, Petitioner's counsel moved for a mistrial, contending that sharing this information in opening statement implied that Dvorsky's murder was related to the case against Petitioner.

In response, the prosecutor told the trial court there was evidence Petitioner was responsible for Dvorsky's death: "... there is in fact evidence that Mr. Jeremy Puckett is involved in her murder. It is just not sufficient to charge him." (Pet. Exh. 69, p. 66 (p. 1814).) "[T]o say there is no evidence [Petitioner killed Dvorsky] is simply not true." (*Id.* at p. 67 (p. 1815).)

In October of 2019, counsel for Petitioner was allowed access to the Sheriff's file regarding the Dvorsky homicide. (See "Declaration of Karyn Sinunu-Towery," filed 11/21/2019.) Petitioner's counsel "read the entire Sheriff's Department report 98-34333 binder and found no mention of Jeremy Puckett by any person or law enforcement officer or witness." (*Id.* at p. 2, ¶ 8.)

Withheld discovery also showed Dvorsky had a history of committing robberies with Jaymo. But there was no evidence she had any relationship with Petitioner. Had defense counsel been made aware of these facts prior to trial, it almost certainly would have changed the defense investigation as well as trial strategy. The California Supreme Court has held that materiality includes consideration of the effect of the

11

nondisclosure on defense investigations and trial strategies. (*Zambrano, supra,* 41 Cal.4th at pp. 1132–1133.) The suppressed evidence referenced above was material.

The prosecutor failed to disclose to the defense the extent of Israel Sept's criminal history. Sept's rap sheet as provided to the defense prior to trial recorded that he suffered a misdemeanor conviction in 1988 and another in1991 for possession of stolen property (Pen. Code § 496).These were originally charged as robberies. Sept pleaded guilty to reduced charges of misdemeanor possession of stolen property. (Pet. Exh. 18.) During Petitioner's trial, defense counsel cross-examined Sept about the misdemeanor convictions. "Q: You have been convicted of stolen property? A: Yes." (Pet. Exh. 69, p. 2091.)

The prosecutor did not disclose the underlying facts and circumstances of the two convictions. Following Sept's contact with law enforcement in 1999, the Sacramento County District Attorney charged him for his participation in the robbery and murder of Anthony Galati. (*People v. Sept,* case no. 00F06163.) The prosecutor prepared an *in limine* motion seeking to introduce evidence of Sept's criminal history should he testify in his defense. (Pet. Exh. 26.) In these prior offenses Sept was initially charged with robbery; however, the charges were reduced to misdemeanor possession of stolen property. In the *in limine* motions the prosecution sought to introduce impeaching evidence of the prior misdemeanor conduct because "the victims were in fact beaten and robbed, notwithstanding the actual conviction sustained." (Pet. Exh. 26.) Pretrial disclosure of this information was required pursuant to Penal Code section 1054.1, subdivision (d), as well as *Bagley, supra,* 473 U.S. at p. 676, and *Giglio, supra,* 405 U.S. at p. 153.

//

**B.    Trial Counsel Rendered Ineffective Assistance**

In the verified petition filed on August 25, 2017, in the California Supreme Court, Petitioner contends that trial counsel rendered constitutionally deficient representation in five areas: (1) failure to introduce Sept's pretrial recantation; (2) failure to correct the timeline; (3) failure to present an alibi defense; (4) failure to attack Van Hill's identification or correct his false testimony; and (5) failure to impeach Patty Scott-Bostic using prior inconsistent statements. (Pet. pp. 64-65.)

The Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The right to counsel attaches with the initiation of adversarial judicial proceedings. (*Kirby v. Illinois* (1972) 406 U.s. 682, 689-90 (plurality opinion); *United States v. McNeil* (9th Cir. 204) 362 F 3d. 570, 572 [the right to counsel attached at indictment, the initiation of adversarial proceedings)].) The constitutional right to the assistance of counsel entitles the defendant not to some bare assistance but rather to effective assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-686 (Strickland).) The right is a cornerstone of our criminal justice system; it has been accorded "not for its own sake, but because of the effect if has on the ability of the accused to receive a fair trial." (*Mickens v. Taylor* (2002) 535 U.S. 162, 166.)

To prevail on a claim of ineffective assistance of counsel, "a defendant must show both deficient performance by counsel and prejudice." (*Knowles v. Mirzayance* (2009) 556 U.S. 111.) To establish deficient performance, a person challenging a

13

1    conviction must show that "counsel's representation fell below an objective standard of

2    reasonableness." (*Strickland v. Washington (1984)* 466 U.S. 668, 688; see also *Roe*

3
     *v. Flores-Ortega* (2000) 528 U.S. 470, 479 (*Roe*) ["the Federal Constitution imposes
4
5    one general requirement: that counsel make objectively reasonable choices"].) A court

6    considering a claim of ineffective assistance must apply a "strong presumption" that

7    counsel's representation was within the "wide range" of reasonable professional

8    assistance. (*Id.* at 689.) The challenger's burden is to show "that counsel made errors

9    so serious that counsel was not functioning as the 'counsel' guaranteed the defendant
10
     by the Sixth Amendment." (*Id.* at 687.) The Supreme Court has explicitly made the
11
12   point that "The  relevant question is not whether counsel's choices were strategic, but

13   whether they were reasonable." (*Roe, supra*, 528 U.S. at 481.)

14
          To establish prejudice, a petitioner must demonstrate "a reasonable probability
15
16   that, but for counsel's unprofessional errors, the result of the proceeding would have

17   been different. A reasonable probability is a probability sufficient to undermine

18   confidence in the outcome." (*Id.* at 694. 694.) "A 'reasonable probability' is, of course,

19   less than a certainty, or even a likelihood." (*United States v. Vargem* (9th Cir. 2014)
20
     747 F.3d 724, 728, citing *United States v. Dominguez-Benitez* (2004) 542 U.S. 74, 86
21
22   (Scalia, J., concurring in the judgment) [observing that the "reasonable probability"

23   standard is more "defendant-friendly" than the "more likely than not" standard].)

24
          (1) Trial Counsel Failed to Introduce Evidence of Sept's Pretrial Recantation
25

26        As discussed above, the case had grown cold until Sept contacted the

27   authorities to provide information. Before Sept came forward his name was not part of
28

14

the investigation into the death of Anthony Galati. (Exh. 69, p. 425 (p. 2215).) Nor was Jeremy Puckett's, Larry Middlebrooks', Patty Scott-Bostic's, or William Van Hill's. (*Id.*)

Sept's statements placed Petitioner at the apartment. Only Sept's testimony identified Petitioner as the shooter. Sept's testimony and credibility were absolutely essential to the prosecutor's case.

Following Sept's contact with law enforcement in 1999, the Sacramento County District Attorney charged him with participating in the robbery and murder of Anthony Galati. (*People v. Sept,* case no. 00F06163.) The court appointed counsel to represent him. The case was assigned out for trial on March 21, 2001. On March 28, 2001, Sept pleaded guilty and agreed to cooperate against Petitioner. The following day the district attorney filed the initial complaint against Petitioner. (*People v. Puckett*, case no. 01F02675.) Petitioner was arraigned on April 5, 2001, and was appointed counsel.

While preparing for trial, counsel for Petitioner and an investigator met with Sept on three occasions. In the course of those interviews he recanted his allegations against Petitioner.

At the close of the first interview, which occurred on August 1, 2001, Sept told them,

> "When I testify, the truth will be different from what's on paper."
> (Pet. Exh. 7, p. 2 (p. 0174).)

On December 12, 2001, at the second interview, Sept said:

Look, I used to sell dope out of Van Hill's apartment all the time. I used to sell crack. For letting me sell out of his place, I would give Van Hill and either money or I would just give him some dope. Van Hill and Middlebrooks used to smoke that stuff in Van Hill's apartment almost every night. I don't remember if Van Hill smoked anything that night, but I know that he was drinking. I think I sold Middlebrooks dope that very night.

"That night, Middlebrooks set up that dude (Galati) to get robbed. Angela and Jaymo were to be part of the robbery. Jeremy wasn't involved. Jeremy knew nothing about robbing anyone.

That night, I was over Van Hill's apartment selling dope. When that dude (Galati) showed up, I thought he was a cop. The dude didn't look like a drug user. What was this White dude who wasn't all smoked out coming up to the apartment for?

I remember that night that Middlebrooks called Jaymo and Angela to rob that dude. I know that Middlebrooks did that because I was standing there when he made the call on the telephone. Jaymo and Angela came over.

Jeremy just showed up sometime later. Jaymo left. I don't know why he left; maybe it was because Jeremy and I were there. Maybe Jaymo was waiting for me and Jeremy to leave before he would rob that dude. Angela stayed. I never saw Jeremy rob anyone that night.

I never saw Jeremy take any money from anyone that night. 'That's the God's truth.'" (Pet. Exh. 8, p. 2 (p. 0178).)


Petitioner's trial began on January 23, 2002. Sept testified in accord with what he initially told the detectives: that Petitioner was the primary actor in the robbery and murder of Galati. Petitioner's counsel questioned him about a recantation, but Sept denied it. (Exh. 69, p. 405 (p.2195).) Counsel failed to challenge Sept further. <u>He did not call the defense investigator to confirm that Sept had, indeed, recanted.</u> Counsel had critically important exculpatory information that he failed to present during the trial.

This court can conceive of no strategic or tactical reason to let Sept's denial of his recantation stand unchallenged. Undermining Sept's testimony was critical to Petitioner's defense.

It was Sept's statement to law enforcement that reopened the investigation. His testimony was essential to the state's case. The limited corroboration by prosecution witnesses Van Hill and Scott-Bostic was weak. The night of the murder Scott-Bostic was smoking crack, drinking a "big old" bottle of cognac, and experiencing the effects of prescription medication. The result, as she told detectives, is that she did not remember much. "Man, I tell you I was in my own world." (Pet. Exh. 22)

Her statements were fraught with revisions and inconsistencies and on one significant point the parties stipulated to the jury that she contradicted herself. (RT 1988:13-20)

Van Hill's corroboration of Sept's testimony was quite limited insofar as he did not see the face of the man he believed to be Petitioner, a man he barely knew. (RT 1878:16-1879:1)

Sept's testimony was essential to identifying Petitioner as someone involved in the robbery and murder of Anthony Galati. Defense counsel's theory of the case was that Israel Sept was a liar who could not be trusted; that he would say anything "to save his own hide." (Exh. 69, p. 524 (p. 2314).) The defense did not challenge any aspect of the investigation of the crime itself (*Id.* at p. 532 (p. 2322).) Defense counsel argued to the jury, "This case isn't that complicated. You determine the believability of Mr. Sept and whether or not he is the type of witness you can believe beyond a reasonable doubt[.]" (*Id.* at p. 559 (p. 2349).)

Without Sept's testimony, there was no care against Petitioner. Accordingly, it was not reasonable for defense counsel to let Sept's denial of the recantation go unchallenged. Omitting to present evidence that Sept said, "other people were

1   involved," and that "I know I said it was this guy, but it was a personal thing" was

2   unreasonable. (Exh. 8, p.1 (p. 0177.) Nor was it reasonable to forebear presenting

3   evidence that Sept said:

4

5       "That night, Middlebrooks set up that dude (Galati) to get robbed. Angela and
        Jaymo were to be part of the robbery, Jeremy wasn't involved. Jeremy knew
6       nothing about robbing anyone.

7       I remember that night that Middlebrooks called Jaymo and Angela to rob that
        dude. I know that Middlebrooks did that because I was standing there when he
8       made the call on the telephone. Jaymo and Angela came over.

9       I never saw Jeremy rob anyone that night. I never saw Jeremy take any money
10      from anyone that night. That's the God's truth." (Id. at p. 2 (p. 0178).)

11      The failure to introduce the recantation into evidence was underscored when
12
    the prosecutor highlighted the three interviews defense counsel conducted with Sept.
13
14  During redirect examination the prosecutor emphasized the interviews: "Q: Have you

15  met with [defense counsel]? A: Yes. Q: How many times? A: I believe three." (Exh. 69,

16  pp. 403-404 (pp. 2193-2194). This left the jury with the false impression that defense

17  counsel interviewed Israel Sept on three occasions and Sept never made statements
18
    inconsistent with his trial testimony.
19

20      As to other witnesses the jury heard evidence of prior inconsistent statements

21  and was instructed accordingly. For example, the prosecutor confronted state's
22
    witness Larry Middlebrooks regarding prior statements he made to Detective Marci
23
24  Minter. (See Exh. 69, pp. 217, 222-223 (p. 2000, 2005-2006).) Later, the state called

25  Det. Minter to testify regarding Middlebrooks' prior inconsistent statements. (Id. pp.

26  427-430 (pp. 2217-2220).) The Court instructed the jury regarding the admissibility of

27  prior inconsistent statements: that they could be considered "as evidence of the truth
28

                                           18

1   of the facts as stated by the witness on that former occasion." (Id. p. 464 (p. 2254).)

2   Counsel's failure to confront Sept with his prior inconsistent statements after raising

3   the issue during cross-examination was simply not reasonable.[2]

4

5       (2) Trial Counsel Failed to Correct the Timeline and (3) Failed to Develop and
        Present an Alibi Defense

6

7       During opening statement the prosecutor told the jury that Anthony Galati went

8   to Rancho Cordova on "March 13th, Friday night" and met up with Larry Middlebrooks.

9   (Exh. 69, p. 8 (p. 1839).) Throughout the trial, the prosecutor did not ask, but rather

10  informed the witnesses of the date of the offense. (See, e.g., Exh. 69, p. 82 (p. 1865)

11  ["Now I'm going to ask you specifically about March the 13th, 1998, the night that

12  there was a problem in your apartment."].) Forensic pathologist Donald Henrickson,

13  testified that by the time the body was found about 3:00 on the afternoon of Saturday,

14  March 14th, the victim had been dead for "several hours." (Id., p.177 (p. 1960).) When

15  speaking with Det. Reed on March 16, 1998, Dr. Henrickson said, "I would think that

16  he probably hadn't been dead for more than 12 hours." (Exh. 54 (p.1505).) This would

17  place the time of death in the early morning hours of March 14, 1998. However, it was

18  established at the evidentiary hearing held in relation to the present petition, and then

19  conceded by Respondent, that the events at issue began on Thursday evening, March

20

21

22

23

24  Petitioner asserts his trial counsel had violated then Rule 2-100 of the California State Bar's
    Rules of Professional Conduct (which generally proscribes communicating with another party,
25  known to be represented by another lawyer in the matter, about the subject of the
    representation) and that a desire to conceal that violation motivated counsel to avoid
26  confronting Sept with the recantation. (Pet. p. 64.) Respondent claims Rule 2-100 only applied
    to civil litigation. (Inf. Resp. p. 61, filed 05/25/2018). It is unnecessary for this Court to address
27  the issue. "Strickland [] calls for an inquiry into the objective reasonableness of counsel's
    performance, not counsel's subjective state of mind." (Harrington v. Richter (2010) 562 U.S.
28  86, 110.) Trial counsel's subjective motivation for the decisions he made is irrelevant.

12, 1998, when Galati went to Rancho Cordova and met up with Middlebrooks, and that Galati was killed in the early morning hours of March 13, 1998. (See Tx of Evid. Hrg. pp. 17-66, (11/14/2019) [testimony of July Melinek]; and pp. 245-246 (11/15/2019) [Counsel for Resp.: "[W]e do not dispute that this killing happened the morning of March 13th of 1998."].)

It was objectively unreasonable for Petitioner's trial counsel to acquiesce in the prosecutor's assertion that time of death was in the early morning hours of March 14th. In Sept's first statement to the detectives he said he rented a motel room immediately following the murder. (Exh. 2, pp. 32-33 (pp. 43-44).) He believed it was about 3:00 or 4:00 in the morning. (*Id.*) The motel receipt establishes that Israel Sept checked into the motel at 4:20 a.m. on March 13, 1998. (Exh. 11 (p. 0189).) These two pieces of information conflict with the forensic pathologist's opinion that Galati "hadn't been dead for more than 12 hours" when he was found on the afternoon of March 14th. Additionally, Galati was last seen on Thursday evening, March 12th. (Exh. 66 (p. 1651).) It was unreasonable for counsel to ignore the conflict and accept the state's erroneous time of death.

Failure to challenge the timeline apparently led counsel to forego an alibi defense. Petitioner's sister, Charon Cabrera Knox, provided declarations (Exh. 64 (pp. 1617-1619)) and testified at the evidentiary hearing that Petitioner was home at a family barbecue on Thursday, March 12, 1998. (Tx of Evid. Hrg. pp. 123-169 (11/14/2019).) Other attendees at the barbecue confirmed the information. (Exh. 64 (pp. 1620-1622).) According to these witnesses, Petitioner was at the family barbecue throughout the day on Thursday, March 12, 1998. He left around 10:00 pm and

returned by 11:30 pm. He spent the rest of the night at home. It appears counsel considered but then rejected the possibility that Galati was killed in the early morning hours of March 13th. Charon Knox states that prior to Petitioner's trial she informed his counsel she was willing to testify regarding Petitioner's activities on March 12, 1998. (Exh. 64 (p. 1618).) Counsel's rejection of the alibi defense and instead adopting the prosecutor's erroneous time of death was objectively unreasonable.

Counsel's decisions prejudiced Petitioner. This was not a strong prosecution case. No physical evidence tied Petitioner to the crime or the crime scene. The case rested on the eye-witness testimony of Israel Sept and the compromised testimony of Scott-Bostic and Van Hill.

Counsel's decision not to present evidence of Israel Sept's recantation of his allegation against Petitioner promoted the false impression that counsel interviewed Sept on three occasions and Sept never contradicted his statement that Petitioner committed the robbery and murder of Anthony Galati. Counsel's failure to challenge the time of death precluded an available alibi defense. Had defense counsel recognized that Galati was killed in the early morning hours of March 13, 1998, then the alibi defense would have been relevant and several witnesses could have testified that Petitioner was at home at the time of the killing.

Here, the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance is overcome. What counsel provided in his representation of Petitioner was not effective assistance when squared up against the measure of counsel guaranteed a defendant by the Sixth Amendment.

*//*

## Remaining Claim

The petition is granted on the first two claims. As it is not necessary to reach a constitutional question not required to decide this writ, the court declines to address the remaining claim: whether Petitioner is factually innocent. Omitting to address the third claim does not express a view of its merits.

Therefore, IT IS HEREBY ORDERED that the petition for writ of habeas corpus is GRANTED.

IT IS FURTHER ORDERED that the conviction and judgment in case number 01F02675 are vacated. The matter is set for further proceedings on March 13, 2020, at 3:00 p.m. in Department 61.

DATED: **3-2-20**

The Honorable Steve White,
Judge of the Superior Court of California,
County of Sacramento

**CERTIFICATE OF SERVICE BY MAILING**
**(C.C.P. Sec. 1013a(4))**

I, the Clerk of the Superior Court of California, County of Sacramento, certify that I am not a party to this cause, and on the date shown below I served the foregoing **WRIT OF HABEAS CORPUS – ORDER GRANTING FOR WRIT OF HABEAS CORPUS** by depositing true copies thereof, enclosed in separate, sealed envelopes with the postage fully prepaid, in the United States Mail at Sacramento, California, each of which envelopes was addressed respectively to the persons and addresses shown below:

Craig Meyers
Deputy Attorney General
State of California
P.O. Box 944255
Sacramento, CA 94244-2550

Morgan Gire
Assistant District Attorney
County of Sacramento
901 G Street
Sacramento, CA 95814

Simpson Thacher &
Bartlett LLP
Harrison J. Frahn IV, ESQ.
Jennifer S. Palmer, esq.
Jacques J. Lamothe, esq.
2475 Hanover Street
Palo Alto, CA 94304

Northern California Innocence
Project At Santa Clara
University School of Law
Linda Starr, Esq.
Karyn Sinunu-Towery, Esq.
500 El Camino Real
Charney Hall, Suite 108
Santa Clara, CA 95053

John Sutton, Warden
Wasco State Prison – Reception
Center (WSP)
701 Scofield Ave.
P.O. Box 4400
Wasco, CA 93280

Jeremy Puckett, T47211
Wasco State Prison –
Reception Center (WSP)
701 Scofield Ave.
P.O. Box 4400
Wasco, CA 93280

California Department of
Corrections and Rehabilitation
Division of Adult Institution
ATTN: Secretary Ralph Diaz
Sacramento, CA 94283

I, the undersigned deputy clerk, declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 3, 2020

Superior Court of California, County of Sacramento

By: _____
H. CRAUN, Deputy Clerk

| | | |
|---|---|---|
| **BOOK** | : 61 | **Superior Court of California,** |
| **DATE** | : **March 3, 2020** | **County of Sacramento** |
| **CASE NO.** | : 19HC00385 | |
| **CASE TITLE** | : **IN RE: Jeremy Puckett** | BY: H. CRAUN |
| | | Deputy Clerk |

Page 1 of 1