# EXHIBIT B



SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SACRAMENTO

| | |
|---|---|
| In re:<br><br>JEREMY PUCKETT<br><br>On Habeas Corpus. | Case No. 19HC00385    Dept. 4<br>01F02675<br><br>**ORDER FINDING PETITIONER**<br>**FACTUALLY INNOCENT**<br>**(Pen. Code, § 1485.55, subd. (b))** |

TO: JEREMY PUCKETT, Petitioner, and Counsel for Petitioner, Northern California Innocence Project, Karyn Sinunu-Towery, Linda Starr, Harrison Frahn, and Jacques Lamothe; and KATHLEEN ALLISON, Secretary of the California Department of Corrections and Rehabilitation, Respondent, and Counsel for Respondent, Richard Miller, Deputy District Attorney:

The court recently granted the petition for writ of habeas corpus and vacated Petitioner's conviction and sentence in case number 01F02675. On March 13, 2020, the court granted the District Attorney's motion to dismiss the charges. Petitioner now moves this court for a finding of factual innocence pursuant to Penal Code section 1485.55, subdivision (b). For the reasons discussed below, the motion is granted.

I. **BACKGROUND**

In case number 01F02675, a jury found Petitioner guilty of the robbery and murder of Anthony Galati and found true the firearm enhancement and special

1

circumstance of murder committed during the commission of a robbery. The jury found Petitioner not guilty of being a felon in possession of a firearm.

On March 14, 2002, the court sentenced Petitioner to 11 years plus life without the possibility of parole.

The conviction and sentence were affirmed on appeal on November 5, 2003. (*People v. Puckett,* 2003 Cal.App.Unpub. LEXIS 10442 (C040743).) The California Supreme Court denied the petition for review on December 16, 2003. (S121183.)

## II. **PRIOR PETITIONS**

The superior court, appellate court and Supreme Court denied Petitioner's prior habeas petitions as follows:

| | |
|---|---|
| 05F00323 | Denied in Superior Court on February 9, 2005 |
| C049451 | Denied in the Court of Appeal, Third Appellate District on April 21, 2005 |
| S134641 | Denied in the California Supreme Court on May 10, 2006 |
| 12HC00552 | Denied in the Superior Court on December 12, 2012 |
| C073079 | Denied in the Court of Appeal, Third Appellate District on February 14, 2013 |
| S210707 | Denied on the California Supreme Court on November 20, 2013 |
| 16HC00248 | Denied in the Superior Court on March 9, 2017 |
| C084586 | Denied in the Court of Appeal, Third Appellate District on July 27, 2017 |
| S243964 | Order to Show Cause issued in the California Supreme Court on July 10, 2019 |

2

## III. **FACTS**

The body of Anthony Galati was found on March 14, 1998. The crime went unsolved until mid-1999, when Israel Sept, then serving a prison sentence in an unrelated case, contacted authorities to say he had information regarding a homicide. On October 5, 1999, detectives interviewed Sept in prison. According to Sept, he, along with Angela Dvorsky and Petitioner, committed the murder of Anthony Galati. Meanwhile, the detectives had also been investigating the homicide of Angela Dvorsky, whose body was found at the end of April of 1998.

The facts, as presented at trial and as summarized by the Third District Court of Appeal, are as follows:

> *Testimony of Israel Sept*
>
> Sept, also known as Easy, met the victim, Anthony Galati, at an Easy Stop store on March 13, 1998.[1] Galati was with Larry Middlebrooks, also known as Richard Pryor, whom Sept knew previously. Sept went with Galati and Middlebrooks to an apartment Middlebrooks shared with William Van Hill. Later, Angela Dvorsky and a man named Jaymo came to the apartment, but Jaymo soon left. Still later, defendant arrived. Sept wanted to sell Middlebrooks and Galati drugs but could not because Galati only had a $ 100 bill and Sept had no change. Middlebrooks and Galati left the apartment and returned twice looking for change, after which Sept sold Middlebrooks some drugs. Middlebrooks and Patty Bostic went into the bathroom. Van Hill was in his bedroom.
>
> Sept went to the bathroom to talk to Middlebrooks and sell him additional drugs. At the time, Dvorsky was sitting on Galati's lap in the dining room. When Sept returned from the bathroom, Galati was lying prone on the living room floor. Defendant was standing over Galati with a gun in his hand, demanding

---

[1] Respondent now concedes that the date of March 13, 1998, is incorrect. The events at issue began on the evening of March 12, 1998. (See Tx of Evid. Hrg. pp. 17-66, (11/14/2019) [testimony of July Melinek]; and pp. 245-246 (11/15/2019) ["[W]e do not dispute that this killing happened the morning of March 13th of 1998."].)

3

money from Galati. Defendant threatened to shoot everyone in the apartment. Sept told him he could not do that and get away with it, then Sept went back to the bathroom to warn its occupants to stay there. As Sept was leaving the bathroom, Van Hill came out of his bedroom. He returned to his bedroom at the urging of Sept and Middlebrooks.

When Sept returned to the living room, Dvorsky was on Galati's back, tying his hands up with two electrical cords, one black and one white. When Dvorsky finished, defendant told Sept, "Come on. Let's go." Sept and defendant lifted Galati to his feet and they left the apartment, with Dvorsky following. They entered the car, putting Galati in the backseat, lying down. Dvorsky laid down on top of him.

Defendant drove the car away from the apartments and eventually to a rural area. Defendant stopped the car and, with Dvorsky's help, took Galati out of the car. Dvorsky got back into the car, and defendant took Galati behind the car. Sept heard two gunshots, after which defendant entered the car and drove to an industrial area where they left the car. They walked to a motel, where Sept checked them in. Sept left the room and went home, leaving defendant and Dvorsky there.

*Other Evidence*

Larry Middlebrooks met Tony Galati at the Easy Market on March 13, 1998. Later that evening, Galati approached Middlebrooks and asked where he could purchase drugs. They went to the apartment shared by Middlebrooks and Van Hill, trying to purchase rock cocaine but unsuccessful because Galati only had a $ 100 bill and no change. They finally purchased rock cocaine elsewhere and both later returned to the apartment.

William Van Hill, Larry Middlebrooks's roommate, had met defendant before March 13, 1998. Sometime after 10:00 p.m. on March 13, 1998, Van Hill went to bed. Defendant, Sept, Dvorsky, Galati, and others were in the apartment at the time. After hearing the noise of someone whimpering, Van Hill came out of the bedroom and told Sept they would have to leave. After Van Hill had gone back to bed, he heard Sept and defendant talking. Again coming out of the bedroom, Van Hill saw Galati and Dvorsky sitting on the floor. Defendant and Sept were aggressively demanding Galati's money and keys. They grabbed Galati by the arms and took him out the front door.

Patty Bostic was at the apartment shared by Middlebrooks and Van Hill on the evening of March 13, 1998, where she saw defendant and others. She went into the bathroom to smoke rock cocaine with Middlebrooks. Twice, Sept came to the door of the bathroom to ask Middlebrooks if Galati had money. She heard scuffling and a man asking someone to stop hitting him. Sept came to the bathroom door and told Bostic and Middlebrooks to stay in there because "defendant wants to kill everybody in the house." Bostic heard the front door open. When she later came out of the bathroom, everyone was gone.

4

Galati's body was found on March 14, 1998, along White Rock Road in Sacramento County. He had died from two gunshots to the back of his head. His hands were tied behind his back with white and black electrical cords, and his wallet and other valuables were gone. His car was found two days later at a nearby apartment complex, fully engulfed in flames. (*Puckett, supra,* 2003 Cal.App.Unpub. LEXIS 10442, **1-5.)

## IV. **DISCUSSION**

What, if any, findings and determinations from the habeas proceedings are binding on the court when deciding the present motion? Petitioner contends all findings and determinations are binding, Respondent contends the court must start from scratch and reassess and decide as to whether it will be readmitted every piece of evidence. Petitioner has the better argument.

In 1941, the California Legislature added Penal Code sections 4900 *et sequentes* under the chapter heading: "Chapter 5 Indemnity for Persons Erroneously Convicted and Pardoned." It set up a process by which pardoned and erroneously convicted individuals could petition the Board for compensation for the erroneous conviction.[2]

Penal Code section 1485.55[3], which Petitioner invokes in the present motion, was added to the Penal Code in 2013 as part of Senate Bill 618 (SB 618). (See Stats. 2013, ch. 800, § 3.) It provides that a finding of factual innocence by the same superior court that decided the petition for writ of habeas corpus is binding on the

---

[2] Originally, it was the State Board of Control to which an individual applied. However, in 2006, the statute was amended and individuals now apply to the California Victim Compensation Board (hereafter "Board"). (Stats 2006 ch 538 § 513 (SB 1852).)

[3] Further undesignated statutory references are to the Penal Code.

5

Board. It was added in part to "streamline the compensation process and ensure consistency between the Board's compensation determinations and earlier court proceedings related to the validity of a prisoner's conviction." (*Madrigal v. California Victim Comp. & Govt. Claims Bd.* (2016) 6 Cal.App.5th 1108, 1118.) Following the 2013 amendments, a recently exonerated individual can seek compensation by petitioning the Board directly via sections 4900, *et seq.*, or, if a superior court has granted a petition for writ of habeas corpus and is familiar with the facts and legal issues, an exonerated individual can petition the court for a finding of factual innocence. That finding is then binding on the Board. (§ 1485.55, subd. (c) ["If the court makes a finding that the petitioner has proven their factual innocence by a preponderance of the evidence pursuant to subdivision (b), the board shall, without a hearing, recommend to the Legislature that an appropriation be made and any claim filed shall be paid pursuant to Section 4904."].)

Sections 4900-4906 outline the procedures before the Board. As part of SB 618 the Legislature also amended section 4903 and added the following language:

> (b) In a hearing before the Board, the factual findings and credibility determinations establishing the court's basis for granting a writ of habeas corpus, a motion for new trial pursuant to section 1473.6, or an application for a certificate of factual innocence as described in section 1485.5 shall be binding on the attorney general, the factfinder, and the Board. (Pen. Code, § 4903, subd. (b).)

Accordingly, following the amendments in 2013, any and all factual findings and credibility determinations a court makes within the context of granting a habeas petition are now binding on the Board.

Nevertheless, Respondent contends that none of the findings made in the course of granting the habeas petition can be considered in the present motion. They contend the only evidence properly before the court for its consideration at the moment is the testimony presented during the course of the trial and evidentiary hearing. Respondent argues that each and every allegation in the habeas petition must be reestablished and readmitted into evidence; that any declaration, or allegation, or other piece of evidence included within the habeas petition must fall within an exception to the hearsay rule. Failing that, the witness or custodian of records must testify before the court.

Respondent's position would render an absurd result and this court is required to "interpret legislative enactments so as to avoid absurd results." (*People v. Torres* (2013) 213 Cal.App.4th 1151, 1158.) If Petitioner applied directly to the Board for compensation, the Board would be bound by the court's factual findings and credibility determinations at the outset. (§ 4903, subd. (b).) It would be absurd to mandate the Board be bound by the court's findings and determinations, but the Petitioner be required to reestablish and readmit evidence and this court be required to make new and different determinations in the course of deciding the present motion.

Subdivision (d) of rule 4.551 of the California Rules of Court is applicable in the present motion. "Any material allegation of the petition not controverted by the return is deemed admitted for purposes of the proceeding." Because Respondent failed to file a return, all material allegations in the petition are deemed admitted for purposes

7

of deciding the habeas petition; and are likewise admitted for purposes of deciding the present motion.

Additionally, Respondent seems to contend that only findings and determinations that address "new evidence" or are made in relation to a "factual innocence" claim are relevant. However, section 4903 is not so limiting. "In a hearing before the Board, the factual findings and credibility determinations establishing the court's basis for granting a writ of habeas corpus [] shall be binding on the attorney general, the factfinder, and the Board." (§ 4903, subd. (b).) Accordingly, whatever findings and determinations were made in granting the writ generally are relevant and can be considered when deciding the present motion.

In conclusion, Petitioner's argument is persuasive. All evidence admitted in the course of the habeas proceedings and all findings and determinations made by the court when deciding the habeas petition are binding when deciding the present motion.

The court now considers the substance of the motion. Petitioner seeks a finding of factual innocence pursuant to Penal Code section 1485.55, subdivision (b). The statute reads, in relevant part:

> In a contested or uncontested proceeding, if the court has granted a writ of habeas corpus or vacated a judgment pursuant to Section 1473.6 or paragraph (2) of subdivision (a) of Section 1473.7, the person may move for a finding of factual innocence by a preponderance of the evidence that the crime with which they were charged was either not committed at all or, if committed, was not committed by the petitioner. (§ 1485.55, subd. (b).)

8

Arguably, the court has already made findings and determinations that decide this motion. Though not express, the findings within the order granting the habeas petition satisfy the preponderance of the evidence standard. Those findings are:

> During opening statement the prosecutor told the jury that Anthony Galati went to Rancho Cordova on "March 13th, Friday night" and met up with Larry Middlebrooks. (Exh. 69, p. 8 (p. 1839).) Throughout the trial, the prosecutor did not ask, but rather informed the witnesses of the date of the offense. (See, e.g., Exh. 69, p. 82 (p. 1865) ["Now I'm going to ask you specifically about March the 13th, 1998, the night that there was a problem in your apartment."].) Forensic pathologist Donald Henrickson, testified that by the time the body was found about 3:00 on the afternoon of Saturday, March 14th, the victim had been dead for "several hours." (Id., p.177 (p. 1960).) When speaking with Det. Reed on March 16, 1998, Dr. Henrickson said, "I would think that he probably hadn't been dead for more than 12 hours." (Exh. 54 (p.1505).) This would place the time of death in the early morning hours of March 14, 1998. However, it was established at the evidentiary hearing held in relation to the present petition, and then conceded by Respondent, that the events at issue began on Thursday evening, March 12, 1998, when Galati went to Rancho Cordova and met up with Middlebrooks, and that Galati was killed in the early morning hours of March 13, 1998. (See Tx of Evid. Hrg. pp. 17-66, (11/14/2019) [testimony of Judy Melinek]; and pp. 245-246 (11/15/2019) [Counsel for Resp.: "[W]e do not dispute that this killing happened the morning of March 13th of 1998."].)
>
> It was objectively unreasonable for Petitioner's trial counsel to acquiesce in the prosecutor's assertion that time of death was in the early morning hours of March 14th. In Sept's first statement to the detectives he said he rented a motel room immediately following the murder. (Exh. 2, pp. 32-33 (pp. 43-44).) He believed it was about 3:00 or 4:00 in the morning. (Id.) The motel receipt establishes that Israel Sept checked into the motel at 4:20 a.m. on March 13, 1998. (Exh. 11 (p. 0189).) These two pieces of information conflict with the forensic pathologist's opinion that Galati "hadn't been dead for more than 12 hours" when he was found on the afternoon of March 14th. Additionally, Galati was last seen on Thursday evening, March 12th. (Exh. 66 (p. 1651).) It was unreasonable for counsel to ignore the conflict and accept the state's erroneous time of death.

Failure to challenge the timeline apparently led counsel to forego an alibi defense. Petitioner's sister, Charon Cabrera Knox, provided declarations (Exh. 64 (pp. 1617-1619)) and testified at the evidentiary hearing that Petitioner was home at a family barbecue on Thursday, March 12, 1998. (Tx of Evid. Hrg. pp. 123-169 (11/14/2019).) Other attendees at the barbecue confirmed the information. (Exh. 64 (pp. 1620-1622).) According to these witnesses, Petitioner was at the family barbecue throughout the day on Thursday, March 12, 1998. He left around 10:00 pm and returned by 11:30 pm. He spent the rest of the night at home. It appears counsel considered but then rejected the possibility that Galati was killed in the early morning hours of March 13th. Charon Knox states that prior to Petitioner's trial she informed his counsel she was willing to testify regarding Petitioner's activities on March 12, 1998. (Exh. 64. (p. 1618).) Counsel's rejection of the alibi defense and instead adopting the prosecutor's erroneous time of death was objectively unreasonable.

Counsel's decisions prejudiced Petitioner. This was not a strong prosecution case. No physical evidence tied Petitioner to the crime or the crime scene. The case rested on the eye-witness testimony of Israel Sept and the compromised testimony of Scott-Bostic and Van Hill. (Order at pp. 19-21, issued 03/03/2020.)

This portion of the order granting the habeas petition found (1) Judy Melinek was a credible witness; and (2) Charon Knox was a credible witness. Regarding Judy Melinek, Respondent conceded the fact that the offense occurred a full 24 hours earlier than asserted at trial. Accordingly, Respondent has conceded Judy Melinek was a credible witness.

Regarding Charon Knox, if she were *not* credible then trial counsel's decision to forgo calling her as a witness would not have fallen below an objective standard of reasonableness – an attorney could not be faulted for failing to call a witness who lacks credibility. And the failure to call her as a witness would not have been prejudicial to Petitioner – if Ms. Knox were not credible, then her testimony would have

had no impact on the trial. Accordingly, the order granting the habeas petition tacitly finds Petitioner is factually innocent. However, to the extent a question remains the court now finds the testimony of Ms. Melinek and Ms. Knox credible. The evidence regarding the time of death presented through witness Judy Melinek and the alibi evidence presented through witness Charon Knox is of greater weight and is more persuasive than the evidence presented and the arguments raised by Respondent.

Other arguments in the motion, opposition, and reply, focus on the minutiae of various witnesses and facts. However, the court need not engage in a fact-by-fact, witness-by-witness dissection of the record. Ultimately, the court find's Israel Sept's testimony at trial wherein he implicated Petitioner is not credible. First, he recanted prior to trial. The evidence of Sept's recantation is properly before the court for consideration by way of the petition for writ of habeas corpus and rule 4.551, subdivision (d).

> When I testify, the truth will be different than what's on paper. (Pet. Ex. 7, at p. 0174 (08/02/2001).)
>
> That night, Middlebrooks set up that dude (Galati) to get robbed. Angela and Jaymo were to be a part of the robbery. Jeremy wasn't involved. Jeremy knew nothing about robbing anyone. (Pet. Ex. 8, at p. 0178 (12/12/2001).)
>
> I never saw Jeremy rob anyone that night. I never saw Jeremy take any money from anyone that night. That's the God's truth. (*Id.*)

As discussed in the order granting the petition, there was no justification for trial counsel's decision to *not* confront Sept with his recantations. Following Petitioner's jury trial, Israel Sept further exonerated Petitioner. Again, evidence of Sept's

11

statements are properly before the court for consideration by way of the petition for writ of habeas corpus and rule 4.551, subdivision (d).

After I found out about my friend, Ben's death, I felt that Jeremy Puckett was responsible somehow for his death so I didn't care what happened to him. I was upset that Ben died and all the other people that were in the house were able to make it out safe because Jeremy helped them. I had heard that Jeremy had been picked up by the police and released. Shortly after Jeremy was release, I was picked up and brought in to be fingerprinted. A vile (sic) of my blood was also take for DNA analysis. The first thing I thought was that Jeremy was trying to pin this case on me. I looked at the situation and thought if I pointed the finger at Jeremy that might help my case.

I ended up taking a deal but was not sentenced right away. I took the deal saying that I would point the finger at Jeremy. At Jeremy's trial I had planned on telling the truth. I was going to tell the court that the night of the incident in question, I was at the apartment with Larry. I remember Middlebrooks calling Jaymo and Angela and telling them to come over. Middlebrooks had been with Tony earlier that day and know that Tony wanted to buy some dope.

I ran into them at the liquor store and Middlebrooks told me that Tony had money to buy some dope. I told them that I would be by later. I went to Middlebrooks and that guy Tony had a hundred dollar bill. I didn't have enough money to break it so he left and came back. That's when Middlebrooks set Tony up. He called Jamo (sic) and Angela and then he left after Jamo (sic) left. Middlebrooks and Patty were in the back doing drugs. After Jeremy left, I didn't see him the rest of the night.

Once I got to Jeremy's trial, I had intended on telling the truth but my attorney came in and told me that if I said that Jeremy was not involved they would take away my deal. I wanted to tell the truth, but I didn't want to face a life term without parole. My attorney also told me that the D.A. could bring back the death penalty if I didn't say what they wanted me to say. I ended up lying at trial because I was afraid to tell the truth. I felt that the police and the D.A. really wanted Jeremy.

When the detectives and D.A. Investigators talked to me, I felt like they were really focusing on Jeremy. I knew if I implicated him it would be better for me. Even in the opening statements at my trial they mentioned

12

Jeremy, so basically I knew what I had to do. I was basically threatened not to tell the truth. I feel like the D.A. knew that they were railroading me. (Pet. Ex. 14, at pp. 0403-0405 (06/13/2003).)

Israel Sept was the sole witness at trial who implicated Petitioner in the murder of Anthony Galati. There was no physical evidence linking Petitioner to the crime or the crime scene. Accordingly, Sept's testimony was critical to the prosecutor's case. The pretrial and post-trial statements by Sept to the trial counsel's investigator undermine his credibility and undermine the prosecutor's entire theory of the case. Accordingly, the court finds the evidence of Sept's recantation and evidence that he lied at Petitioner's trial presented by Petitioner is of greater weight and more persuasive than the evidence presented and the arguments raised by Respondent. The court finds by a preponderance of the evidence that Petitioner is factually innocent.

Petitioner's motion for a finding of factual innocence filed pursuant to section 1485.55, subdivision (b) is GRANTED. The court finds Petitioner factually innocent of the robbery and murder of Anthony Galati. The court further finds Petitioner factually innocent of Count 3, felon in possession of a firearm in violation of former section 12021, subdivision (a).

DATED: 1-15-21

The Honorable Steve White,
Judge of the Superior Court of California,
County of Sacramento



13



## CERTIFICATE OF SERVICE BY MAILING

### C.C.P. Sec. 1013a(4))

I, the undersigned deputy clerk of the Superior Court of California, County of Sacramento, do declare under penalty of perjury that I am not a party to the action within and that I did this date place a copy of the above entitled notice in envelopes addressed to each of the parties, or their counsel of record as stated below, with sufficient postage affixed thereto and deposited the same in the United States Mail at 720 9th Street, Sacramento, California.

Craig Meyers
Deputy Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

Simpson Thacher & Bartlett LLP
Harrison J. Frahn IV, esq., Jacques Lamothe, esq.
2475 Hanover Street
Palo Alto, CA 94304

Kathleen Allison
California Department of Corrections
and Rehabilitation Division of Adult
Institution
Sacramento, CA 94283

Xavier Becerra
Attorney General of the State of California
1300 "I" Street
Sacramento, CA 95814-2919

Richard Miller
Sacramento County District Attorney
901 G Street
Sacramento, CA 95814

Northern California Innocence Project
Linda Starr, Esq., Karyn Sinunu-Towery, Esq.
500 El Camino Real, Charney Hall, Suite 108
Santa Clara, CA 95053

I, the undersigned deputy clerk, declare under penalty of perjury that the foregoing is true and correct.

Dated: January 19, 2021

Superior Court of California, County of Sacramento

By: _____*Heidi Craun*_____
H. Craun, Deputy Clerk

1