1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Jeremy Phillip Puckett,                    No. 2:22-cv-00350-KJM-DB

12                    Plaintiff,                ORDER

13        v.

14   County of Sacramento, et al.,

15                    Defendants.

16

17        Plaintiff Jeremy Puckett brings this § 1983 action against several defendants who played a

18   part in his wrongful murder and robbery conviction.[1]  Defendants move to dismiss for failure to

19   state a claim and move to strike portions of the complaint.  The court **grants defendants'**

---

[1] The defendants are the County of Sacramento; the Sacramento County Sheriff's Office; the Sacramento County District Attorney's Office; Deputy District Attorney Marjorie Durenberger; Sheriff's Office detectives Marci Minter, Lori Gregersen, Willard Bayles, Robert Bell, Kay Maulsby; forensic pathologist Dr. Donald Henrikson; and fifty Doe defendants.  This order refers to all of the defendants affiliated with Sacramento County (both the individuals and the offices) as the County Defendants and refers to the individual detectives as the "Detectives."

     As noted, the complaint names fifty Doe defendants.  If defendants' identities are unknown when the complaint is filed, plaintiffs have an opportunity through discovery to identify them.  *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  But the court will dismiss such unnamed defendants if discovery clearly would not uncover their identities or if the complaint would clearly be dismissed on other grounds.  *Id.* at 642.  The federal rules also provide for dismissing unnamed defendants that, absent good cause, are not served within 90 days of the complaint.  Fed. R. Civ. P. 4(m).

1

1  **motions in part** as explained below.  The court **dismisses plaintiff's first claim against**
2  **Durenberger with leave to amend, dismisses the official capacity claims against the**
3  **individual defendants without leave to amend and dismisses the fourth claim against the**
4  **District Attorney's Office in part without leave to amend.**

5  **I.      BACKGROUND**

6         This action arises from Puckett's 2001 prosecution and conviction for the robbery and
7  murder of Anthony Galati.  Compl. ¶ 73, ECF No. 1.  In 2020, almost 19 years later, the
8  California superior court granted plaintiff's writ of habeas corpus and vacated his convictions.  *Id.*
9  ¶ 2.  A year later, the superior court found plaintiff factually innocent.  *Id.*  Plaintiff then filed this
10  action under 42 U.S.C. § 1983.  In broad strokes, he alleges the defendants deprived him of his
11  constitutional rights by withholding or ignoring exonerating evidence.  At this stage, the court
12  assumes the following allegations are true and views those allegations in the light most favorable
13  to plaintiff.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

14         **A.      Galati's Murder and Resulting Investigation**

15         On the evening of Thursday, March 12, 1998, Anthony Galati left friends to buy cocaine
16  from Larry Middlebrooks and Israel Sept.  Compl. ¶¶ 27–28.  Middlebrooks brought Galati to an
17  apartment and, without Galati's knowledge, shared Galati's location with James "Jaymo" Reeves
18  and Angela Dvorsky.  *Id.* ¶ 30.  Sept, Dvorsky and Jaymo then restrained and robbed Galati
19  before murdering him and disposing of his body on a rural road.  *Id.* ¶¶ 31–34.  His body was
20  found two days later.  *Id.* ¶ 26.

21         Meanwhile, plaintiff, who had visited Sept at the same apartment earlier that night, had
22  returned to his mother's home and spent the night with family.  *Id.* ¶ 29.  Plaintiff alleges
23  Detectives in the Sacramento Sheriff's Office, a prosecutor in the District Attorney's Office, and
24  a forensic pathologist all suppressed or fabricated evidence in the ensuing investigation, which
25  led to plaintiff's conviction.  *See generally id.*

26         First, detectives Minter, Bayles, Gregersen, Maulsby and Bell "played active roles in the
27  Galati investigation," including by investigating the crime scene, interviewing witnesses and
28  handling evidence.  *Id.* ¶¶ 35–36.  However, they "were unable to develop any solid leads."  *Id.*

1   ¶ 35.  More than a year later, Sept, who at the time was incarcerated for an unrelated offense,

2   informed the Detectives of his role in the Galati murder and implicated plaintiff in the crime,

3   stating "he had seen Jeremy Puckett—with Dvorsky acting as his accomplice—pistol–whip, rob,

4   and kill Mr. Galati."  *Id.* ¶ 38.  Sept's confession came just twelve days after authorities collected

5   Sept's DNA and Sept had become worried about officers connecting him to the Galati murder.

6   *Id.* ¶ 37.  Both before and after plaintiff's trial, Sept confessed he fabricated his accusations

7   against plaintiff because "he harbored a personal grievance."  *Id.* ¶ 39.  Most witnesses could not

8   corroborate Sept's story, and in fact told the Detectives plaintiff had already left the apartment at

9   the time of the robbery.  *Id.* ¶ 41.  Prosecutors nevertheless offered Sept a plea deal in exchange

10   for his testimony against plaintiff.  *Id.* ¶ 44.

11       Plaintiff further alleges the Detectives did not follow other viable leads in the murder

12   investigation, including credible evidence implicating Jaymo.  *Id.* ¶¶ 42–43.  A parallel

13   investigation into Dvorsky's death six weeks after Galati's death led Detectives to "hundreds of

14   pages" of evidence exonerating plaintiff, including information showing: (1) Dvorsky and

15   plaintiff had no relationship, (2) near the time of Galati's murder, Dvorsky and Jaymo were living

16   together near the murder scene, (3) witnesses made statements connecting Jaymo to the murder,

17   and (4) a pistol fitting Galati's murder investigation belonged to Jaymo.  *Id.* ¶ 52–55.  However,

18   the Detectives continued to target plaintiff in their investigation and suppressed this exculpatory

19   evidence from prosecutors and plaintiff's criminal defense counsel.  *Id.* ¶¶ 51–56.

20       Second, plaintiff alleges the District Attorney's Office and Durenberger kept exonerating

21   evidence from plaintiff's criminal defense counsel.  *Id.* ¶ 58.  Durenberger was actively involved

22   in the investigation against plaintiff and withheld exculpatory information including: (1) the

23   evidence of Sept's motive for testifying against plaintiff, (2) Sept's prior convictions, and

24   (3) evidence that would have permitted plaintiff to impeach those who testified against him with

25   their prior convictions.  *Id.* ¶¶ 61–62.  During state habeas proceedings, the superior court found

26   the prosecution's suppression of evidence violated plaintiff's constitutional rights under *Brady v.*

27   *Maryland*, 373 U.S. 83 (1963).  *Id.* ¶ 79; Ex. A Compl. (Habeas Order), ECF No. 1-1.

Third, plaintiff alleges Dr. Henrikson, the coroner who had contracted with Sacramento County and who performed Galati's autopsy, fabricated and suppressed evidence concerning Galati's time of death. *Id.* ¶¶ 63, 67. After conducting an autopsy, Henrikson concluded Galati's time of death was in the early morning of Saturday, March 14, 1998. *Id.* ¶ 65. Plaintiff alleges Henrikson did not follow standard procedures in the field of forensic pathology in calculating this approximate time. *Id.* ¶ 67. Instead of using multiple factors to determine time of death, including rigor mortis and discovery scene temperature and weather, Henrikson relied solely on body lividity. *Id.* ¶ 68. Additionally, in calculating body lividity, Henrikson "recklessly or deliberately misapplied the science in his field" because he did not take temperature into account in his lividity measurements. *Id.* Later court proceedings established Galati's accurate time of death to be the early morning of March 13, 1998, approximately 24 hours earlier than Henrikson's estimation. *Id.* ¶ 66. Plaintiff alleges Henrikson was aware of the methodological flaws in his analysis but refused to update his findings or inform detectives and prosecutors of his mistakes. *Id.* ¶¶ 69–71. Henrikson's flawed assessment allowed defendants to discredit evidence showing plaintiff had already left Sept's apartment by the time of Galati's murder. *Id.* ¶¶ 83–84.

**B.     Customs and Practices of the District Attorney and Sacramento County**

Plaintiff alleges the evidence suppression in his case "did not occur in a vacuum" but instead was the product of customs and practices in Sacramento County, the Sacramento County Sheriff's Office and the Sacramento County District Attorney's Office, all "encourag[ing] the abuse of constitutional rights." *Id.* ¶¶ 90, 112.

Within the Sheriff's department, plaintiff alleges detectives violated suspects' constitutional rights in four similar cases, three of which involved *Miranda* or Sixth Amendment violations. *Id.* ¶¶ 90–92, 94–96, 109. Plaintiff says his attempt to identify further violations was met with resistance. His current counsel submitted a California Public Records Act request to the Sacramento County Counsel for information on any prosecutorial misconduct between 1990 and 2005. *Id.* ¶ 98. The Sheriff's Office notified plaintiff it had no such records, and the County produced a spreadsheet "reflecting data from claim forms submitted to the County . . . to seek compensation from Sacramento County." *Id.* ¶¶ 99–100. Each row on the spreadsheet contained

4

a field vaguely describing the claim, including rows with phrases such as "civil rights violation" or "police misconduct." *Id.* ¶ 104. Plaintiff alleges a "substantial number of the incompletely recorded claims for civil rights violations against the Sacramento Sheriff's Office . . . were based on allegations of evidence manipulation, including suppression of exculpatory evidence." *Id.* ¶ 106. Plaintiff also alleges the Sheriff's department "failed to create and maintain *any* disciplinary records" despite intentional civil rights violations. *Id.* ¶¶ 107, 111 (emphasis in original).

Similarly, plaintiff describes three other *Brady* violations by the District Attorney's Office between 1995 and 2002. *Id.* ¶¶ 114–16. Plaintiff's counsel "sent a California Public Records Act request to the Sacramento District Attorney's Office" and Sacramento County requesting information on other alleged prosecutorial misconduct. *Id.* ¶ 118. The District Attorney's Office responded it did not have an index cataloging alleged misconduct and refused to hand-search individual employees' files for such information. *Id.* Relying on the County's spreadsheet, plaintiff identifies 46 claims against the District Attorney's Office, 36 of which were between 1995 and 2002. *Id.* ¶ 122. Plaintiff alleges, on information and belief, a "substantial number of the incompletely recorded claims for civil rights violations" were based on allegations of evidence suppression. *Id.* ¶ 125.

**C.      Procedural History**

Plaintiff asserts four claims, all under § 1983. First, he asserts a claim against Detectives Minter, Bayles, Gregersen, Maulsby, Bell and Doe defendants, as well as District Attorney Durenberger, for *Brady* violations. *Id.* ¶¶ 135–40. Second, plaintiff asserts a claim against Dr. Henrikson and the Doe defendants for fabricating evidence. *Id.* ¶¶ 141–46. Third, plaintiff asserts claims against Sacramento County and the Sacramento County Sheriff's Office under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* ¶¶ 147–53. Finally, plaintiff brings a *Monell* claim against the Sacramento District Attorney's Office. *Id.* ¶¶ 154–60.

As noted above, defendants, in two groups, have moved to dismiss and strike portions of the complaint. First, the County Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) and move to strike the prayer for injunctive relief under Federal Rule of Civil

1    Procedure 12(f)(2).  *See* County Mot., ECF No. 16; County Mem., ECF No. 16-1.  Second,

2    Henrikson moves to dismiss under Federal Rule of Civil Procedure 12(b)(6) and moves to strike

3    allegations about his testimony in plaintiff's criminal trial under Federal Rule of Civil Procedure

4    12(f)(2).  *See generally* Henrikson Mot., ECF No. 18; Mot. to Strike, ECF No. 19; Mem. to

5    Strike, ECF 19-1.  Plaintiff opposes all the motions.  *See generally* Opp'n County, ECF No. 23;

6    Opp'n Henrikson, ECF No 22.  Defendants have replied.  *See* County Reply, ECF No. 24;

7    Henrikson Mem., ECF No. 25.  The court held a combined hearing and scheduling conference on

8    November 4, 2022.  Harrison (Buzz) Frahn, Jordan Lamothe and Ryan Snyder appeared for

9    plaintiff, John Whitefleet appeared for County defendants and Pamela Shafer appeared for

10   Henrikson.

11        The court addresses jurisdiction initially, and then the motions to strike and dismiss.

12   **II.    JURISDICTION**

13        While neither party has questioned this court's subject matter jurisdiction, "[f]ederal

14   courts are required sua sponte to examine jurisdictional issues such as standing."  *Chapman v.*

15   *Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (citation omitted) (alterations in

16   original).  If the court determines at any time it lacks subject-matter jurisdiction, it must dismiss

17   the action.  Fed. R. Civ. P. 12(h)(3).

18        This court dismisses plaintiff's prayer for injunctive relief based on lack of subject matter

19   jurisdiction.  Standing to sue is a necessary component of the court's subject matter jurisdiction.

20   *Cetacean City. V. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).  Accordingly, if a plaintiff lacks

21   standing, the court lacks subject matter jurisdiction.  *Id.*  To satisfy Article III's standing

22   requirements, a plaintiff must show (1) he has suffered an "injury in fact" that is concrete and

23   particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

24   traceable to the challenged action of the defendant; and (3) it is likely, not merely speculative,

25   that a favorable decision would redress the injury.  *Friends of the Earth, Inc. v. Laidlaw Envtl.*

26   *Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (*citing Lujan v. Defs. Of Wildlife*, 504 U.S. 555,

27   560–61 (1992)).

1       A plaintiff seeking prospective injunctive relief, as here, "must demonstrate that he has

2   suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a

3   sufficient likelihood that he will again be wronged in a similar way.'" *Bates v. United Parcel*

4   *Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (internal citation omitted) (quoting first *Lujan*,

5   504 U.S. at 560, then *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  The latter inquiry

6   turns on whether the plaintiff has a "real and immediate threat of repeated injury." *Id.* (internal

7   quotations omitted) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  The threat of future

8   injury cannot be "conjectural or hypothetical" but must be "certainly impending" to constitute an

9   injury in fact for injunctive relief purposes.  *Davidson v. Kimberly–Clark Corp.*, 889 F.3d 956,

10  967 (9th Cir. 2018) (emphasis omitted).

11      Plaintiff seeks to enjoin "Sacramento County, the Sheriff's Office, and the District

12  Attorney's Office from engaging in unconstitutional policies of evidence suppression and

13  appointing an independent monitor" to ensure compliance.  Compl. ¶ 162.  But plaintiff has

14  already been declared factually innocent of all charges and released from prison.  *Id.* ¶ 2.  Plaintiff

15  does not show any "real or immediate" threat of facing further incarceration or being subject to a

16  faulty and unconstitutional investigation by defendants.  Thus, plaintiff's prayer for injunctive

17  relief is dismissed for lack of standing.

18  **III.    MOTIONS TO STRIKE**

19      **A.    Legal Standard**

20      Federal Rule of Civil Procedure 12(f) provides "[t]he court may strike from a pleading . . .

21  any redundant, immaterial, impertinent, or scandalous matter."  The granting of a motion to strike

22  "may be proper if it will make trial less complicated or eliminate serious risks of prejudice to the

23  moving party, delay, or confusion of the issues." *Taheny v. Wells Fargo Bank, N.A.*, No.

24  10–2123, 2011 WL 1466944, at *2 (E.D. Cal. Apr. 18, 2011) (citing *Fantasy, Inc. v. Fogerty*,

25  984 F.2d 1524, 1527–28 (9th Cir. 1993)).  However, "[m]otions to strike are disfavored and

26  infrequently granted." *Neveau v. City of Fresno*, 392 F. Supp. 2d 1159, 1170 (E.D. Cal. 2005)

27  (citations omitted).

7

1    County Defendants move to strike plaintiff's prayer for injunctive relief.  Because the

2    court has already dismissed these claims for lack of standing, this motion is moot.

3    Henrikson moves to strike plaintiff's allegations regarding Henrikson's testimony in

4    plaintiff's criminal trial.  *See generally* Mot. to Strike.  Specifically, Henrikson argues as a

5    witness he has absolute immunity for trial testimony, and thus the testimony is immaterial.  Mem.

6    to Strike at 3.  Plaintiff, however, does not ask this court to hold Henrikson accountable for his

7    trial testimony, but instead offers his testimony in support of plaintiff's claim that Henrikson

8    fabricated autopsy findings and shared incorrect information with prosecutors and detectives.  *See*

9    *generally Compl.*  Thus, the testimony is not immaterial and the motion to strike is **denied.**

10   **IV.    MOTIONS TO DISMISS**

11       **A.    Legal Standard**

12   A party may move to dismiss for "failure to state a claim upon which relief can be

13   granted."  Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint lacks a

14   "cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

15   *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v.*

16   *Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual

17   allegations are true and construes "them in the light most favorable to the nonmoving party."

18   *Steinle v. City & Cnty. Of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks*

19   *Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's

20   allegations do not "plausibly give rise to an entitlement to relief," the motion must be granted.

21   *Iqbal*, 556 U.S. at 679.

22   A complaint need contain only a "short and plain statement of the claim showing that the

23   pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), not "detailed factual allegations."  *Bell Atl.*

24   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But this rule demands more than unadorned

25   accusations; "sufficient factual matter" must make a claim at least plausible.  *Iqbal*, 556 U.S. at

26   678*.*  In the same vein, conclusory or formulaic recitations of elements do not alone suffice.  *Id.*

27   (citing *Twombly*, 550 U.S. at 555).

1    **B.     Analysis**

2         **1.     Redundant Official Capacity Claims**

3         As a preliminary matter, "[w]hen both a municipal officer and a local government entity

4    are named, and the officer is named only in an official capacity, the court may dismiss the officer

5    as a redundant defendant." *Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*,

6    533 F.3d 780, 799 (9th Cir. 2008); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As

7    long as the government entity receives notice and an opportunity to respond, an official-capacity

8    suit is, in all respects other than name, to be treated as a suit against the entity.").  Therefore, the

9    court **dismisses with prejudice** the official-capacity claims against individual defendants.

10         **2.     Rule 8 and Shotgun Pleading**

11         Courts have used the term "shotgun pleading" to describe several different pleading

12    problems, including a complaint that does not differentiate defendants and a complaint that

13    impermissibly "incorporate[s] each preceding paragraph, regardless of relevancy."  *See, e.g.*,

14    *Destfino v. Kennedy*, No. 08-1269, 2008 WL 4810770, at *3 (E.D. Cal. Nov. 3, 2008), *aff'd sub*

15    *nom. Destfino v. Reiswig*, 630 F.3d 952 (9th Cir. 2011).

16         Here, County Defendants argue plaintiff "describe[s] a wide variety of conduct by

17    different individuals" over a lengthy complaint, and say he impermissibly incorporates these facts

18    by reference into each claim for relief.  County Mem. at 5.  Additionally, County Defendants

19    argue the complaint makes general allegations against groups of defendants but does not

20    articulate how each defendant violated plaintiff's Fourteenth Amendment rights or show how

21    each individual officer or prosecutor was aware of fabricated or withheld evidence.  *Id.* at 6.

22         Plaintiff's complaint is not a shotgun pleading.  It is long but logically organized and

23    gives defendants enough information to understand the legal claims against them and the

24    allegations supporting those claims.  *See generally* Compl.  For example, the complaint alleges

25    Detectives Minter Bayles, Gregersen and Maulsby all knew Sept's confession was contradicted

26    /////

27    /////

9

1    by evidence but hid this evidence from prosecutors and plaintiff's criminal defense counsel.  *Id.*

2    ¶ 4.  Additionally, the complaint:

3    • introduces the action, *id.* ¶¶ 1–9;

4    • explains who the parties are, *id.* ¶¶ 10–25;

5    • alleges who did what and when, including which detectives were told specific

6    information, and what evidence was withheld or suppressed by detectives and the

7    prosecutor.  *Id.* ¶¶ 25–89;

8    • claims the defendants violated the law and explains why, using separate

9    subsections for each of the four claims, *id*. ¶¶ 135–160;

10   • requests relief, *id* ¶ 162; and

11   • demands a jury trial, *id.* ¶ 161.

12   In sum, the allegations and claims are clear and plain enough to meet the standard of Rule

13   8(a).

14                    **3.      Prosecutorial Immunity**

15   County Defendants argue defendant Durenberger, as a Deputy District Attorney, enjoys

16   absolute immunity to the claims against her.  County Mem. at 8–9.

17   State prosecuting attorneys are absolutely immune from damages under § 1983 when the

18   case concerns acts within the scope of their duties as prosecutors, *Imbler v. Pachtman*, 424 U.S.

19   409, 422–23 (1976), carrying out "the traditional functions of an advocate," *Kalina v. Fletcher*,

20   522 U.S. 118, 131 (1997).  Absolute immunity protects even against claims of malicious

21   prosecution, use of perjured testimony and suppression of material evidence.  *See Imbler*,

22   424 U.S. at 430.

23   Here, Durenberger is absolutely immune to claims regarding her actions "preparing for the

24   initiation of judicial proceedings or for trial," including preparing and submitting sworn

25   declarations.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  Plaintiff therefore may not

26   maintain this action against Durenberger based on his allegation she "suppressed substantial

27   impeachment evidence" in preparing for trial.  Compl. ¶ 61; *see also Santana v. Cnty. Of Yuba*,

28   No. 150794, 2016 WL 1268107, at *14 (E.D. Cal. Mar. 31, 2016) (finding prosecutors who

                                               10

1    "knowingly presented incompetent and irrelevant evidence, withheld exonerating evidence, and

2    maliciously prosecuted" were protected by absolute immunity).  A claim could potentially be

3    asserted against Durenberger based on the nature of her participation in investigations leading up

4    to the prosecution.  *See id.* (citing *Buckley*, 509 U.S. at 273).  At hearing, plaintiff represented he

5    could allege with more specificity violations based on Durenberger's participation in the

6    investigations in his case.  Thus, the court **dismisses with leave to amend** plaintiff's claim

7    against Durenberger, if amendment is possible within the confines of Federal Rule of Civil

8    Procedure 11.

9                                   **4.      Qualified Immunity**

10          Defendant Henrikson argues he is entitled to qualified immunity in his capacity as a

11   forensic pathologist.  *See generally* Henrikson Mot.  The two–pronged test currently used for

12   assessing whether qualified immunity applies was first articulated in *Saucier v. Katz*, 533 U.S.

13   194 (2001).  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201).

14   Under that test, the court first "decide[s] whether the facts that a plaintiff has alleged or shown

15   make out a violation of a constitutional right."  *Id.* (internal citations omitted).  Then, "if the

16   plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly

17   established' at the time of defendant's alleged misconduct."  *Id.* (citing *Saucier*, 533 U.S. at 201).

18   "[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party

19   seeking summary judgment."  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).  "[W]hen there are

20   disputed factual issues that are necessary to a qualified immunity decision, these issues must first

21   be determined by the jury before the court can rule on qualified immunity."  *S.R. Nehad v.

22   Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th

23   Cir. 2017)).  Since *Pearson*, courts are "permitted to exercise their sound discretion in deciding

24   which of the two prongs of the qualified immunity analysis should be addressed first in light of

25   the circumstances in the particular case at hand."  555 U.S. at 236.  This court exercises its

26   discretion in addressing the first prong of qualified immunity first.

27          Henrikson has not shown he is entitled to qualified immunity at this stage.  He argues his

28   actions were merely negligent, but "negligence alone will not defeat qualified immunity."

                                              11

1   *Brewer v. Hayne*, 860 F.3d 819, 825 (5th Cir. 2017).  During the November hearing, Henrikson's

2   counsel ceded qualified immunity would not apply if Henrikson acted recklessly or deliberately.

3   The court assumes plaintiff's factual allegations are true, *Steinle*, 919 F.3d at 1160, and plaintiff

4   alleges Henrikson "deliberately fabricated evidence" and "recklessly or deliberately misapplied

5   the science of his field."  Compl. ¶¶ 63, 68.  Thus, Henrikson's motion is **denied, without**

6   **prejudice**.

7               **5.**     ***Monell* Claims**

8       Section 1983 provides "[e]very person who, under color of [law] . . . subjects, or causes to

9   be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured

10  by the Constitution and laws, shall be liable to the party injured . . . ."  42 U.S.C. § 1983.  This

11  section has been applied to include municipalities and other local governments as "persons" who

12  are subject to liability.  *Monell*, 436 U.S. at 690.  Municipalities "are responsible only for their

13  own illegal acts."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis in original) (citations

14  and internal quotation marks omitted).  Municipalities "cannot be held liable [for the actions of

15  their employees] under § 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.

16  Instead, the constitutional injury must occur during the execution of an official "policy or

17  custom."  *Id.* at 694.

18      Ultimately, to establish municipal liability under *Monell*, a plaintiff must prove: "'(1) that

19  [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the

20  municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

21  constitutional right; and, (4) that the policy is the moving force behind the constitutional

22  violation.'"  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v.*

23  *Sch. Dist. No. 40 County. Of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).  "Official municipal

24  policy includes the decisions of a government's lawmakers, the acts of its policymaking officials,

25  and practices so persistent and widespread as to practically have the force of law."  *Connick*,

26  536 U.S. at 61 (citations omitted).  The Ninth Circuit recognizes four theories establishing

27  municipal liability under *Monell*: "(1) an official policy; (2) a pervasive practice or custom; (3) a

1    failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton*

2    *by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

3          To sufficiently plead a *Monell* claim and withstand a Rule 12(b)(6) motion to dismiss,

4    allegations in a complaint "may not simply recite the elements of a cause of action but must

5    contain sufficient allegations of underlying facts to give fair notice and to enable the opposing

6    party to defend itself effectively." *A.E. ex rel. Hernandez v. Cnty. Of Tulare*, 666 F.3d 631, 637

7    (9th Cir.2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

8          Plaintiff asserts *Monell* claims against the Sacramento County and Sheriff's Office and the

9    District Attorney's Office.

10                        **a)      Sacramento County and Sheriff's Office**

11         While plaintiff alleges separate *Monell* liability claims against the Sheriff's Office and

12   Sacramento County, plaintiff relies on the same allegations regarding both offices in his

13   complaint, and more explicitly groups the two defendants together when discussing *Monell*

14   liability in his opposition brief.  *See* Compl. ¶¶ 90–111; Opp'n at 13–15.  Thus, this court will

15   also analyze the allegations against these offices together.

16         Plaintiff alleges the Sacramento County Sheriff's Office engaged in a practice or custom

17   of manipulating and suppressing evidence and refusing to discipline officers who violated

18   persons' constitutional rights.  Compl. ¶ 90.  Plaintiff alleges these practices "created and

19   maintained a culture of impunity . . . . that encouraged the abuse of constitutional rights." *Id.*

20   Thus, plaintiff asserts *Monell* liability under two theories: (1) pervasive customs and policies, and

21   (2) failure to train or discipline.  As discussed below, plaintiff has alleged enough to survive

22   defendants' motions to dismiss.

23         First, "[l]iability for improper custom may not be predicated on isolated or sporadic

24   incidents; it must be founded upon practices of sufficient duration, frequency and consistency that

25   the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d

26   911, 918 (9th Cir. 1996).  The pattern of incidents must reflect "similar constitutional violations."

27   *Connick*, 563 U.S. at 62.  Plaintiff describes two instances of violations, separated by eight years,

28   in which Sherriff's deputies committed similar constitutional violations in the form of evidence

                                                       13

1    suppression: his own case and a similar incident in 2008, in which deputies falsely testified they

2    had no tapes of a civilian encounter.  Compl. ¶ 109.  The other alleged violations are unrelated to

3    evidence suppression.  *Id.* ¶¶ 91–97.  When plaintiff asked the Sheriff's Office about other

4    violations, he was told no records existed.  *Id.* ¶ 99.  But plaintiff also asked the County for

5    information on misconduct in the Sheriff's Office and received a spreadsheet identifying 314

6    claims against that Office from 1995 through 2002.  *Id.* ¶¶ 101–02.  The County provided only

7    vague descriptions of each claim, such as "civil rights violations" or "false arrest," making it

8    difficult to identify misconduct factually similar to violations in his own case.  *Id.* ¶ 102.

9    However, plaintiff identified 79 claims labeled as "civil rights violations" or "police misconduct."

10   *Id.* ¶ 104.  Plaintiff alleges, on information and belief, "a substantial number of" the records

11   "were based on allegations of evidence manipulation."  *Id.* ¶ 106.  While plaintiff cannot, without

12   discovery, allege multiple detailed incidents with factual similarities to his own, it is not from his

13   own lack of trying.  Moreover, at this stage of the litigation plaintiff does not need to set out

14   "detailed factual allegations."  *Bell Atl. Corp.*, 550 U.S. at 555.  Identifying 79 civil rights

15   violations over seven years brings plaintiff's claim from the merely possible to plausible and puts

16   defendants adequately on notice of the allegations, *J.M. by & Through Rodriguez v. Cnty. Of*

17   *Stanislaus*, No. 118-01034, 2018 WL 5879725, at *5–6 (E.D. Cal. Nov. 7, 2018) (finding

18   allegations of five specific incidents during a thirteen-month time-period was enough to plead

19   widespread conduct under a *Monell* theory of liability); *Meehan v. Cnty. Of Los Angeles*,

20   856 F.2d 102, 107 (9th Cir. 1988) (holding two unconstitutional incidents over three months,

21   without other allegations, was not enough to show a custom or practice.).  Thus, plaintiff survives

22   defendant's motion to dismiss under this *Monell* theory.

23          Second, plaintiff alleges the Sheriff's Office has not disciplined officers who deprive

24   persons of their constitutional rights.  Compl. ¶ 90.  Because the Sheriff's Office and County

25   could not or did not provide plaintiff with any disciplinary records and only vague summaries of

26   claims records, plaintiff alleges the Office failed to "create and maintain any disciplinary records

27   for its detectives," which in itself "reflects a deliberate or reckless administrative failure."  *Id.*

28   ¶ 107 (emphasis omitted).  For similar reasons as above, the number of claims of civil rights

1  violations and lack of disciplinary records make plaintiff's allegations against defendants

2  plausible such that his claim survives the motion to dismiss.

3       Lastly, the Ninth Circuit has held a failure to discipline a single officer's repeated offenses

4  "might be enough to support" a claim of *Monell* liability.  *Milke v. City of Phoenix*, No. 1500462,

5  2016 WL 5339693 (D. Ariz. Jan. 8, 2016); *see also, e.g.*, *Velazquez v. City of Long Beach*,

6  793 F.3d 1010, 1028 (9th Cir. 2015); *Hayes v. Riley*, 525 F. Supp. 3d 1118, 1121 (N.D. Cal.

7  2020).  The officer's violations may be dissimilar.  *See Hayes*, 525 F. Supp. at 1121.  Here,

8  plaintiff alleges Officer Stanley Reed violated defendants' constitutional rights without

9  consequence.  Compl. ¶¶ 91, 93–95.  However, Reed is not a defendant in this case and plaintiff

10  informed the court during the hearing that Reed has died.  Plaintiff also informed the court he is

11  not naming Reed's estate as a defendant.

12       For the reasons above, defendants' **motion to dismiss *Monell* liability is denied.**

13            **b)      Sacramento County District Attorney**

14       Plaintiff alleges the Sacramento District Attorney's Office has a policy of "selectively

15  withholding exculpatory evidence relevant to criminal prosecutions from defense teams" and

16  "failing to hold prosecutors accountable" for the ensuing *Brady* violations."  Compl. ¶¶ 112, 117.

17  Thus, plaintiff asserts *Monell* liability against this Office under the same two theories:

18  (1) pervasive customs and policies and (2) failure to train or discipline.  The court must first

19  decide if, under each liability theory, the Office acted as an arm of the state or county.

20       Agencies acting as arms of the state are immune from § 1983 claims in federal and state

21  court.  *See Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 375, 377, 383 (1990).  The

22  status of a District Attorney's Office depends on "whether the particular acts the official is

23  alleged to have committed fall within the range of his state or county functions."  *Ceballos v.*

24  *Garcetti*, 361 F.3d 1168, 1182 (9th Cir. 2004), *rev'd and remanded on other grounds*, 547 U.S.

25  410 (2006) (quoting *McMillian v. Monroe County*, 520 U.S. 781, 785–86 (1997)).  The Ninth

26  Circuit has held that in California, "prosecutorial functions" are classified as state actions, while

27  "administrative or other non–prosecutorial duties" are classified as county actions.  *Id.* at 1183;

28  *see also Goldstein v. City of Long Beach*, 715 F.3d 750, 755 (9th Cir. 2013).  In *Goldstein*, a

1    District Attorney Office's failure to systematically track informant reliability was an

2    administrative failure and not a prosecutorial action.  715 F.3d at 762.  The California Supreme

3    Court has drawn a similar distinction, *see Pitts v. Cnty. of Kern*, 17 Cal. 4th 340, 363 (1998)

4    (labeling prosecutor's preparation to prosecute and "oversight of policies formulated and training

5    conducted in connection with" prosecution as prosecutorial functions).

6           First, plaintiff argues the prosecutor's allegedly pervasive policy encouraging or tolerating

7    *Brady* violations was an administrative decision, akin to the decision in *Goldstein*.  *See* 715 F.3d

8    at 762.  In *Goldstein*, the court found the act of setting up a central recording system "used to help

9    prosecutors comply with their constitutional duties" was administrative because it did not

10   "involve prosecutorial strategy."  *Id.*  However, in this case, the issue was not a lack of an

11   administrative structure to help prosecutors carry out their duties.  Rather, the informal policy

12   alleged was the prosecutorial act of individual prosecutors' committing constitutional violations.

13   Compl. ¶ 90.  Plaintiff also cites to *Milke v. City of Phoenix,* in which a district court found—after

14   noting the similarities in the organization of California's and Arizona's prosecutorial offices

15   analyzing *Goldstein*—office wide policies such as "the disclosure of evidence" are

16   administrative.  No. 15-00462, 2016 WL 5339693, at *17–18 (D. Ariz. Jan. 8, 2016).  *Milke* of

17   course is not binding on this court.  As delineated in *Goldstein*, the question here is whether the

18   conduct is part of a prosecutorial strategy or rather properly characterized as "administrative

19   oversight."  715 F.3d at 762.  Plaintiff's allegations that the Office encouraged or tolerated *Brady*

20   violations is a "polic[y] or training relating to prosecutorial functions" and is not properly

21   characterized as an administrative action removed from the prosecutorial fray.  *Id.*  Thus, the

22   district attorney acts on behalf of the state and plaintiff is **barred from bringing this *Monell***

23   **claim.**

24          Second, plaintiff argues *Goldstein* supports his position that the district attorney's failure

25   to discipline prosecutors who committed *Brady* violations was administrative and thus the Office

26   acted as an arm of the county.  Here, this court agrees.  A failure to discipline can expose a failure

27   in oversight and administration.  *See Goldstein*, 715 F.3d at 762.  Unlike the direct commission of

28   a *Brady* violation, a failure to discipline is not tied directly to "prosecutorial strategy" but is

1    reflective of administrative policies and oversight of employees.  *Id.*  In failing to discipline, the

2    District Attorney's Office acted as an arm of the county and is subject to *Monell* liability.

3         Specifically, plaintiff alleges the District Attorney's Office did not have an index or

4    tracking system that allowed it to detect *Brady* violations and possible prosecutorial misconduct.

5    Compl. ¶ 118.  Instead, the Office informed plaintiff it would need to "hand search individual

6    employees' files" to find this information, which it declined to do.  *Id.*  Using the County's

7    spreadsheet, plaintiff identified 46 claims against the District Attorney's Office between 1990 to

8    2005, each with either vague descriptions such as "Clmt said his Civil Rights were violated" or

9    "denial/Viol. Civ" or no descriptions at all.  *Id.* ¶ 123.  Defendants argue plaintiff has not pointed

10   to specific evidence or circumstances in which defendants have failed to discipline prosecutors, or

11   any concrete examples of specific *Brady* violations.  County Reply at 5.  As explained above,

12   however, plaintiff at this stage cannot be faulted because defendants refuse to search their files or

13   produce detailed information.  In showing 46 potential claims over a specific period of time,

14   plaintiff has demonstrated his allegations are sufficiently "plausible" and therefore defeats the

15   motion to dismiss in this respect.  *Iqbal*, 556 U.S. at 678.

16   **V.    CONCLUSION**

17        The court dismisses plaintiff's official capacity claims against the individual defendants

18   without leave to amend.  The court **dismisses plaintiff's first claim with leave to amend in**

19   **part, and plaintiff's fourth claim in part, as specified above.**  Plaintiff must file any amended

20   complaint **within 21 days**.

21        This order resolves ECF Nos. 16, 18, and 19.

22        IT IS SO ORDERED.

23   DATED:  March 8, 2023.

24   _____
                    CHIEF UNITED STATES DISTRICT JUDGE
25